**2021 IL 123010**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 123010)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
DERRELL DORSEY, Appellant.

*Opinion filed July 29, 2021.*

JUSTICE MICHAEL J. BURKE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Overstreet, and Carter concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

## OPINION

¶ 1 The central issue in this case is whether good-conduct credit is relevant to the determination of what constitutes a *de facto* life sentence for a juvenile offender for purposes of applying the principles enunciated in *Miller v. Alabama*, 567 U.S. 460

(2012). We hold that good-conduct credit is relevant and that a sentence imposed pursuant to a statutory scheme that affords a juvenile an opportunity to be released from prison after serving 40 years or less of the term imposed does not constitute a *de facto* life sentence.

¶ 2                                    BACKGROUND

¶ 3        Around 7 p.m. on March 11, 1996, defendant kicked open a door to a takeout restaurant in Chicago and began firing a gun at four customers who were waiting for their food. Defendant killed 16-year-old Tyran Snow and severely injured 13-year-old Irene Williams and 16-year-old Calvin Sims. The fourth customer was able to flee the restaurant uninjured through another door. After she was taken to the hospital, Williams told police that defendant—whom she knew from school—was the shooter.

¶ 4        Defendant was 14 years old at the time of the shooting. The State filed a delinquency petition and asked for permission to prosecute him in adult criminal court. After hearing evidence and considering the appropriate statutory and non-statutory factors, the juvenile court allowed defendant's prosecution to proceed in adult criminal court. A grand jury subsequently indicted defendant on charges of first degree murder for Snow's death and attempted murder and aggravated battery with a firearm for the injuries inflicted upon Williams and Sims.

¶ 5        Defendant was convicted following a jury trial in August 1998 of one count of first degree murder and two counts of attempted first degree murder.[1] At the sentencing hearing, the trial court received a presentence investigation (PSI) report. According to the PSI, defendant's parents were married but had a long history of substance abuse and separated frequently. Defendant lived primarily with his mother until the age of 10, while his father was in and out of prison; defendant spent his summers with his grandmother. After age 10, defendant's grandmother was his primary caretaker.

¶ 6        According to the PSI, defendant reported that his childhood took a downward turn in the seventh grade when he joined a street gang. At age 13, he was arrested

---

[1]The jury also returned guilty verdicts on the aggravated-battery charges, but the trial court merged them with the attempted murder convictions.

for robbery, adjudicated delinquent, and sentenced to juvenile probation. Defendant violated his probation when he committed the offenses in this case.

¶ 7    The PSI further indicated that, while awaiting trial, defendant obtained an eleventh-grade education in the juvenile detention center with "very good grades." His teacher stated that he was an "excellent student motivated to learn."

¶ 8    The State presented the testimony of Adrian Bowman at the sentencing hearing. Bowman testified that he was 16 years old and had resided with defendant at the juvenile detention center. While at the detention center two months earlier, defendant perpetrated an unprovoked attacked on Bowman when he hit Bowman in the face with a chair while they were playing cards. Three of defendant's friends then jumped on Bowman and began punching him in the head. The injury from the chair attack required that Bowman receive eight stitches to his lip.

¶ 9    Bessie Snow, the grandmother of Tyran Snow, read her victim impact statement to the court. She stated that Tyran's death was a tremendous shock to her. She had given him the money to buy food at the restaurant on the evening of his murder. She felt guilty because, if she had not given him the money, he might still be alive. She noted that her grandson was kind and loving to everyone and would be missed by many.

¶ 10   The State also presented victim impact testimony from Tyran Snow's great aunt. The court then had the record reflect that it had reviewed the victim impact statements of Williams and Sims.

¶ 11   Sheila Teague, defendant's aunt, testified in mitigation for the defense. She stated that she had lived with defendant in the same house and that he was "always a good kid" who respected adults and was not a troublemaker. She acknowledged, however, that defendant became a member of the Black Stone street gang when he was 13. She was unaware that he had been convicted of a juvenile robbery and placed on probation. She told the court that she prayed defendant would not be incarcerated all his life and hoped that one day he would be able to drive a car, have children, and go to the store.

¶ 12 Seana Teague also testified in mitigation. She stated that she was defendant's cousin but that he was like a brother to her because she was an only child. She testified that defendant was a "good boy" who always had good grades in school.

¶ 13 The prosecutor asked the court to impose a "more severe sentence," with the sentences for the various convictions running consecutively. He based his recommendation upon several factors, including the unprovoked nature of the offenses, which evinced a total disregard for human life and caused death and severe bodily injury. The prosecutor recounted how defendant ambushed four persons as he stood in the doorway of a tiny carryout restaurant and started shooting. The result was that Snow suffered a gruesome, terrifying death and Sims was rushed to the hospital in critical condition in need of various surgeries. The prosecutor was sure that Snow would one day want an opportunity "to have children, drive a car, or go to the store." The prosecutor also told the court that not only did defendant's actions demonstrate a disregard for life inside the restaurant but also a total disregard for the southside community that surrounds the restaurant, "that wants a peaceful life and has every reason to expect that their community should be free from people like [defendant]." He implored that people should be able to "walk down *** the street from their house and order something from the corner restaurant without the fear of being shot and killed." The prosecutor urged that a substantial sentence was necessary to deter others and send a message that gang violence such as this would not be tolerated.

¶ 14 The prosecutor further argued that, although defendant was 14 years old at the time of the offenses in question and therefore did not have much of an opportunity to establish a prior criminal record, he was on probation at the time he committed the murder and attempted murder offenses and, rather than take that opportunity to conform his actions to that of a law-abiding citizen, he continued with gang activity, which led to the commission of these more serious crimes. Citing defendant's attack on Bowman, the prosecutor maintained that defendant's actions continued to show a disregard for others. The prosecutor concluded that, even though defendant was of a tender age, he had left the court with no option other than to sentence him to a significant period of incarceration.

¶ 15 Defense counsel asked the court to impose a sentence that would allow defendant to rejoin society again with time to contribute to it. He argued that there

was no evidence that tied the murder and attempted murder offenses to gang activity. But that violence in the streets and gang activity was "happening with many, many young children who are both victimized and victims because of a failing that has happened somewhere in our society." He argued that defendant was a young teenage boy whose choices reflected the intelligence and lack of judgment of a youth, which also resulted from society's failures and a broken family that included an alcoholic mother and a father who was repeatedly in jail and involved with drugs and alcohol. He noted that defendant was left so unsupervised he had to be relegated to the care of his grandmother. As to the prior juvenile robbery conviction, counsel maintained that defendant was not an experienced criminal and that the offense was simply the theft of a bicycle rather than a robbery.

¶ 16    Defense counsel also argued that defendant had improved himself since committing the instant offenses. He was now an eleventh-grade student, maintaining a B average, and doing well. As to the attack on Bowman, counsel stated that he did not have a reason why it happened but that it is "not unusual for these young men to have it out with each other." Finally, counsel asked the court to be merciful and allow defendant "a future in our society again when he continues to grow, as he continues to learn, as he continues to modify his behavior and as he pursues successes that can be obtained in the institution so he can join us in society again."

¶ 17    In pronouncing its sentence, the trial court noted that it had presided over the trial, was very familiar with the case, and had considered the nature and character of the offenses, defendant's character and history, the PSI, the evidence presented at the sentencing hearing, the parties' arguments in aggravation and mitigation, and the statutory aggravating and mitigating factors.

¶ 18    Reviewing the statutory factors in aggravation and mitigation, the trial court stated as follows:

"[D]efendant's conduct threatened serious harm to others. Obviously, the charges to which the defendant has been convicted inherently recognize harm to certain individuals.

However, I do note that outside [the three victims], the defendant's conduct threatened serious harm to other individuals that were in that restaurant,

including the other individual who was named to be inside the waiting area and the individual[s] that were working in the restaurant. Their safety was certainly put in jeopardy by this attack by the defendant. So, I find that that factor in aggravation certainly *** applies.

In mitigation, obviously I recognize the youth of Mr. Dorsey. In some respects, I would say that Mr. Dorsey might count himself to be a fortunate person. Because those of us that are intimately familiar with the facts of this incident, know that it was certainly just a fortuitous happening that Mr. Dorsey only killed one person. And injured two others. Because from the nature of this attack that he launched on that restaurant, that evening, it would be very possible that Mr. Dorsey would be sitting here charged with four murders. And facing a life sentence in prison.

* * *

We all know from the facts of this case that Mr. Dorsey simply kicked open that door, walked in and started indiscriminately shooting. And everybody dove for cover and three people were hit, one person wasn't. All those people could be dead today. It certainly wasn't as a result of lack of trying of Mr. Dorsey that they are not.

It was a very small space that those people were running around trying to dodge those bullets. So, when I reviewed the facts of this case and I tried to come to a description as to what I thought would be the term that would characterize Mr. Dorsey's actions, I came up with indiscriminate ruthlessness.

Now, it's clear from the presentence investigation, also from the facts of this case, that Mr. Dorsey was a gang member. And, when I talk about indiscriminate ruthlessness, I have to talk about *** the argument that well one gang member shot another gang member. But, of course, that's a totally unacceptable argument. And society has the right to demand that persons conduct themselves according to the law and obviously society has the right to demand that one person not take another person's life.

But *** the real inherent evil of gang crime is *** that so often the people that get hurt are in addition to the targets, the innocent bystanders. ***

- 6 -

* * *

But the fact of the matter is, three people were shot. And that's what happens. Because when you have indiscriminate gang violence, everybody in the area gets hit. So, it's not just the death or wounding of an intended target who may or may not be a gang member, it's everybody else that's affected by gang crime. And that is particularly aggravating."

¶ 19     The trial court then sentenced defendant to consecutive terms of 40 years for the first degree murder of Snow, 18 years for the attempted first degree murder of Williams, and 18 years for the attempted first degree murder of Sims. Thus, the aggregate sentence imposed resulted in a 76-year term of imprisonment.

¶ 20     Defendant filed a direct appeal, arguing that his sentence was excessive because the trial court failed to adequately consider his age and rehabilitative potential. The appellate court affirmed. *People v. Dorsey*, 315 Ill. App. 3d 1219 (2000) (table) (unpublished order under Illinois Supreme Court Rule 23). It first found that defendant "waived" his claim by not raising it in his postsentencing motion. *Id.* The appellate court then found that, regardless of the waiver, the trial court properly considered the factors relevant to defendant's sentence, where it expressly stated that it had reviewed and applied the statutory aggravating and mitigating factors, including that it had considered defendant's youth as a mitigating factor. *Id.* The appellate court concluded that the trial court had not abused its discretion in imposing defendant's sentence. *Id.*

¶ 21     In June 2001, defendant filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (725 ILCS 5/2-1401 (West 2000)), alleging that his consecutive sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The circuit court denied the petition, and defendant did not appeal that ruling. Defendant filed a second section 2-1401 petition in March 2007, asserting that his indictments were based on a nonexistent statute and therefore the trial court lacked jurisdiction to convict and sentence him. The circuit court denied that petition also, and the appellate court affirmed. *People v. Dorsey*, 385 Ill. App. 3d 1127 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23). In October 2012, defendant filed a third section 2-1401 petition, which once again challenged his consecutive sentences. The circuit court denied this petition as well, and the appellate court affirmed in a summary order.

¶ 22       Defendant also filed postconviction petitions. In 2005, defendant filed a *pro se* postconviction petition, alleging that his trial and appellate counsel were ineffective in several respects, that the trial court improperly imposed consecutive sentences, and that the statutory scheme requiring consecutive sentences and permitting transfer to criminal court violated *Apprendi*. The circuit court dismissed the petition. The appellate court, however, reversed the first-stage dismissal and remanded for further proceedings, finding that defendant had stated the gist of a claim for ineffective assistance of trial counsel. *People v. Dorsey*, 373 Ill. App. 3d 1146 (2007) (table) (unpublished order under Illinois Supreme Court Rule 23). In November 2010, appointed counsel filed an amended postconviction petition, which alleged actual innocence and claims unrelated to defendant's sentence. The circuit court rejected defendant's actual-innocence claim and dismissed the petition as untimely. The appellate court affirmed in a summary order, and this court denied defendant's petition for leave to appeal.

¶ 23       On December 17, 2014, defendant filed a petition for leave to file a successive petition for postconviction relief, along with the petition itself. These pleadings are the subject of this appeal and, so far as is relevant here, raised a claim that defendant's aggregate sentence violated the eighth amendment of the United States Constitution and the United States Supreme Court's ruling in *Miller*, 567 U.S. 460. Defendant also raised a second claim in his successive petition, arguing that he was denied his constitutional right to a fair trial because of an erroneous jury instruction on the factors to be considered in assessing identification testimony. This second claim is not at issue in this appeal.

¶ 24       On his first claim, defendant argued that, although his 76-year aggregate sentence is not technically a natural life sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections. *Miller* held that the eighth amendment forbids "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. *Miller* concluded that, although it was not foreclosing the imposition of life sentences for juveniles convicted of murder, it was requiring sentencing courts to first "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 25    Defendant argued before the circuit court that he could establish cause and prejudice for the filing of his successive postconviction petition because (1) *Miller* was decided after he filed his initial postconviction petition and (2) he would have been given a less severe sentence if the trial court had considered the ideas espoused in *Miller*.

¶ 26    The circuit court denied defendant's petition for leave to file a successive postconviction petition, finding both of defendant's claims to be frivolous. Regarding the eighth amendment sentencing claim, the court stated that, although defendant may be able to show cause for his failure to raise his claim in an earlier petition, he is unable to show prejudice. This is because "he was not sentenced to mandatory life without the possibility of parole in violation of the Supreme Court's holding in *Miller*."

¶ 27    Defendant appealed to the appellate court, arguing that the circuit court erred in denying him leave to file a successive postconviction petition based upon *Miller*. Defendant recognized before the appellate court that he was eligible for day-for-day credit because he was sentenced in 1998, before the truth-in-sentencing statute was validly enacted, and thus he is scheduled to be released from prison on September 20, 2034, at the age of 53. Nonetheless, defendant maintained that his sentence constituted a *de facto* life sentence in violation of *Miller*.

¶ 28    The appellate court rejected defendant's argument and affirmed the circuit court's denial of leave to file the successive postconviction petition. 2016 IL App (1st) 151124-U. It found that defendant established cause for failing to raise his claim sooner but could not establish prejudice because he did not receive a *de facto* life sentence and that therefore the requirements of *Miller* were inapplicable to this case. *Id.* ¶¶ 23, 37. The appellate court determined that the availability of day-for-day sentencing credit was relevant to the analysis:

    "The great weight of authority on this issue indicates that a court looks, not only to the total sentence imposed, but to the availability and amount of sentence credit applicable to a given sentence before determining whether it actually amounts to a *de facto* life sentence without the possibility of parole. [Citations.] *** We join that authority, and decline to look to defendant's total 76-year sentence in a vacuum, without consideration of his scheduled release

date or the fact that he will likely receive the day-for-day credit for which he is eligible." *Id.* ¶ 29.

¶ 29 We allowed defendant's petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 30 ANALYSIS

¶ 31 The Post-Conviction Hearing Act (Act) allows a criminal defendant to assert in a petition that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2014). Postconviction proceedings are collateral to proceedings on direct appeal and thus "focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25. For that reason, the doctrine of *res judicata* bars issues that were raised and decided on direct appeal, and forfeiture precludes issues that could have been raised but were not. *Id.*

¶ 32 "The Act itself contemplates the filing of a single petition ***." *People v. Lusby*, 2020 IL 124046, ¶ 27. As a result, a defendant faces "immense procedural default hurdles when bringing a successive postconviction petition." *People v. Davis*, 2014 IL 115595, ¶ 14. These hurdles are lowered only in very limited circumstances so as not to impede the finality of criminal litigation. *Id.* A petitioner must obtain leave of court to file a successive petition. 725 ILCS 5/122-1(f) (West 2014); *Lusby*, 2020 IL 124046, ¶ 27. To obtain leave of court, a defendant must demonstrate "cause" for the failure to raise the claim in the initial petition and that "prejudice" resulted from that failure. *Lusby*, 2020 IL 124046, ¶ 27. The Act provides that "cause" is shown by a defendant identifying an objective factor that impeded the ability to raise a specific claim during the initial postconviction proceeding; "prejudice" is shown by demonstrating that the claim not raised during the initial proceeding so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f) (West 2014).

¶ 33 Leave of court to file a successive petition should be denied when it is clear from a review of the successive petition and supporting documents that the claims raised fail as a matter of law or are insufficient to justify further proceedings. *People*

*v. Smith*, 2014 IL 115946, ¶ 35. This court conducts *de novo* review of the denial of a motion for leave to file a successive postconviction petition. *Lusby*, 2020 IL 124046, ¶ 27; *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 34    Defendant argues that the appellate court erred in finding that he failed to satisfy the prejudice prong of the cause-and-prejudice test as a prerequisite to bringing his successive petition raising the eighth amendment *Miller* claim. The State concedes that defendant has established "cause" for not raising the *Miller* claim earlier but argues that defendant cannot establish prejudice because he did not receive a *de facto* life sentence that would trigger the requirements of *Miller*.

¶ 35    We agree that the appellate court correctly found that the "cause" prong was established here. *Miller* set forth a "new substantive rule," which "constitutes 'cause' because [a claim based on *Miller*] was not available earlier." *Davis*, 2014 IL 115595, ¶ 42. Thus, the only relevant question here is whether defendant can establish the prejudice prong of the threshold test for bringing a successive petition.

¶ 36            I. *Relevant Eighth-Amendment Legal Principles*

¶ 37    We begin our analysis with a review of the relevant legal principles. The eighth amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The Supreme Court has held that, to comply with the eighth amendment, sentences must be "graduated and proportioned." *Id.* And children are treated as "constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. Juveniles have diminished culpability and greater prospects for reform; therefore, " 'they are less deserving of the most severe punishments.' " *Id.* (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)).

¶ 38    In *Graham*, the Supreme Court held that the eighth amendment categorically prohibits "the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham*, 560 U.S. at 82. The Court determined that, because of the differences between juvenile and adult offenders, the sentence imposed on a juvenile who has not committed homicide must afford the juvenile "some meaningful opportunity to obtain release based on demonstrated maturity

- 11 -

and rehabilitation." *Id.* at 75. And "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id.*

Two years later in *Miller*, the Supreme Court held that the eighth amendment "forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile [homicide] offenders." *Miller*, 567 U.S. at 479. In support of its holding, *Miller* cited *Graham* and referenced the principle set forth therein that " '[a] State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* (quoting *Graham*, 560 U.S. at 75). Mandatory-life-sentencing statutes are constitutionally flawed, according to *Miller*, because they remove consideration of youth from the determination of whether to impose the harshest sentence and pose too great a risk of disproportionate punishment. *Id.* But *Miller* did not foreclose the possibility of discretionary life sentences for juvenile homicide offenders. *Id.* at 480. "Instead, the Court mandated a 'certain process—considering an offender's youth and attendant characteristics' before a trial court may impose such a sentence." *Lusby*, 2020 IL 124046, ¶ 33 (quoting *Miller*, 567 U.S. at 483).

¶ 39     In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court held that *Miller* applied retroactively. *Montgomery* reversed the juvenile defendant's mandatory life sentence as a violation of *Miller* and remanded for resentencing. In doing so, it reiterated that "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that *life without parole* is a proportionate sentence." (Emphasis added.) *Id.* at 209-10. In giving *Miller* retroactive effect, *Montgomery* emphasized that the focus is not on the court-imposed sentence but on whether the State provides an opportunity for release: States need not "relitigate sentences *** in every case where a juvenile offender received mandatory life without parole." *Id.* at 212. But instead, they "may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.*

¶ 40     After briefing and oral arguments were completed in the case before us, the United States Supreme Court decided *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021). There, the Court held that the defendant's eighth amendment argument that "the sentencer must make a finding of permanent incorrigibility" before imposing a discretionary life without parole sentence "is inconsistent with the Court's precedents." *Id.* at ___, 141 S. Ct. at 1311. Instead, the Court found that

the eighth amendment allows juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider youth and attendant characteristics but that no factfinding by the sentencer is required. *Id.* at \_\_\_, 141 S. Ct. at 1314-15. The Court noted that *Miller* and *Montgomery* squarely rejected the idea that the eighth amendment "requires more than just a discretionary sentencing procedure" (*id.* at \_\_\_, 141 S. Ct. at 1314) and that *Montgomery* stated that " '*Miller* did not impose a formal factfinding requirement' and that 'a finding of fact regarding a child's incorrigibility . . . is not required.' [Citation.]" *Id.* at \_\_\_, S. Ct. at 1315-16.

¶ 41    Following the decisions in *Miller* and *Montgomery*, some state courts limited the Supreme Court's holdings in those cases to only *mandatory* life without parole sentences. See *Holman*, 2017 IL 120655, ¶ 40 (collecting cases). This court in *Holman*, however, held that *Miller* and *Montgomery* apply to *discretionary* life without parole sentences as well. *Id.* This holding is questionable in light of *Jones*.

¶ 42    In addition to *Holman*, we note that this court held in *People v. Patterson*, 2014 IL 115102, ¶ 110, that a juvenile nonhomicide offender's 36-year aggregate sentence was not "the most severe of all criminal penalties" and did not violate the eighth amendment. *Patterson* explained that " '[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime,' but only give those offenders 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* ¶ 108 (quoting *Graham*, 560 U.S. at 75). In upholding the defendant's sentence, the *Patterson* court considered sentencing credit relevant to the analysis. This court noted that the defendant "was statutorily mandated to serve at least *85% of his total prison term* [citation]*, or 30 years, 7 months*." (Emphasis added.) *Id. Patterson* reasoned that, although lengthy, that term is not comparable to either the death penalty or the second most severe penalty permitted by law—life in prison without parole. *Id.*

¶ 43    Next, in *People v. Reyes*, 2016 IL 119271, ¶ 9 (*per curiam*), this court held that "sentencing a juvenile [homicide] offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole" violates the eighth amendment. In that regard, *Reyes* stated as follows:

> "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual

mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id.*

¶ 44 In assessing whether the defendant's sentence was the "functional equivalent" of life in prison without the possibility of parole, *Reyes* (in an approach like the one taken in *Patterson*) considered the impact of the availability of statutory good-conduct credit:

"In this case, defendant committed offenses in a single course of conduct that subjected him to a legislatively mandated sentence of 97 years, *with the earliest opportunity for release after 89 years*. Because defendant was 16 years old at the time he committed the offenses, the sentencing scheme mandated that he remain in prison until at least the age of 105. The State concedes, and we agree, that defendant will most certainly not live long enough to ever become eligible for release. Unquestionably, then, under these circumstances, defendant's term-of-years sentence is a mandatory, *de facto* life-without-parole sentence." (Emphasis added.) *Id.* ¶ 10.

¶ 45 Finally, in *People v. Buffer*, this court assessed when a juvenile defendant's prison term is long enough to be considered a *de facto* (functional equivalent of) life without parole sentence. 2019 IL 122327, ¶¶ 29, 40. We noted that this court will "generally defer to the legislature in the sentencing arena because the legislature, institutionally, is better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id.* ¶ 35 (citing *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005); *People v. Koppa*, 184 Ill. 2d 159, 171 (1998)). We further noted in *Buffer* that a few years after *Miller* was decided, the General Assembly enacted a new juvenile sentencing scheme, which determined that a juvenile offender must remain in prison for a minimum of 40 years if convicted of certain first degree murders that would warrant natural life in prison for an adult offender. *Id.* ¶¶ 36, 39. The General Assembly required those juvenile offenders to serve the entirety of the 40-year term and provided no opportunity for good-conduct credit to reduce the period of incarceration. 730 ILCS 5/3-6-3(a)(2)(i), 5-4.5-105(c), 5-8-1(a)(1)(c) (West 2016); see also 730 ILCS 5/5-4.5-115(b) (West 2020) (declining to extend parole eligibility to this category of juvenile offenders).

¶ 46 *Buffer* stated that "[t]he legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*." 2019 IL 122327, ¶ 39. "Extrapolating from this legislative determination," *Buffer* held that a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation and therefore does not constitute a *de facto* life sentence in violation of the eighth amendment. *Id.* ¶ 41.

¶ 47                    II. *Relevance of Good-Conduct Credit*

¶ 48 In the case now before us, the parties disagree on the effect the availability of day-for-day, good-conduct credit has on the question of whether a *de facto* life sentence without the possibility of parole has been imposed. Defendant maintains that eligibility for sentencing credit is irrelevant to the determination and cites Illinois Appellate Court cases that have held accordingly. See *People v. Daniel*, 2020 IL App (1st) 172267, ¶ 24; *People v. Thornton*, 2020 IL App (1st) 170677, ¶¶ 19-22; *People v. Hill*, 2020 IL App (1st) 171739, ¶ 41; *People v. Figueroa*, 2020 IL App (1st) 172390; *People v. Quezada*, 2020 IL App (1st) 170532, ¶¶ 7-9; *People v. Peacock*, 2019 IL App (1st) 170308, ¶¶ 18-19. The State, on the other hand, posits that good-conduct credit must be taken into account because the focus is rightly on the sentencing scheme in its entirety, not just the sentence imposed, as *Miller* forbids a "sentencing scheme" that results in life in prison without the possibility of parole for juvenile homicide offenders. See *Miller*, 567 U.S. at 479. Moreover, all that is required to uphold the sentence against the instant attack based on *Miller*, according to the State, is " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' " (see *id.* (quoting *Graham*, 560 U.S. at 75)), before the juvenile reaches *Buffer*'s line drawn at more than 40 years. The availability of good-conduct credit offers that opportunity, it argues, and the appellate court cases cited by defendant are therefore unpersuasive. We agree with the State.

¶ 49 Here, the underlying murder and attempted murder offenses were committed in 1996, and defendant was sentenced in 1998 before the truth-in-sentencing statute

was *validly* enacted.[2] Defendant is therefore eligible for day-for-day credit. Thus, defendant has an opportunity to demonstrate maturity and rehabilitation so that he only needs to serve 38 years of his aggregate 76-year sentence. Thus, we hold that defendant was not sentenced to the functional equivalent of a life sentence without the possibility of parole in violation of *Buffer*'s more-than-40-years pronouncement.

¶ 50        While it is true that the trial court sentenced defendant to a 76-year aggregate term of imprisonment, it is the legislature, through the statutory scheme that it has enacted, that determines how much of that sentence the person must serve. And it has offered the opportunity for early release by providing that "every person sentenced to imprisonment *** shall serve the full term of a determinate sentence *less time credit for good behavior and shall then be released*." (Emphasis added.) 730 ILCS 5/3-3-3(c) (West 1994). The statutory scheme applicable to defendant *requires* that a person receive "one day of good conduct credit for each day of service in prison," where each day of credit must "reduce by one day the inmate's period of incarceration set by the court." (Emphasis added.) *Id.* § 3-6-3(a)(2); see also *id.* § 5-8-7(b) ("The offender shall be given credit on the determinate sentence *** for time spent in custody as a result of the offense for which the sentence was imposed, at the rate specified in Section 3-6-3 of this Code."). Thus, the statutory scheme here mandates the application of day-for-day credit to determinate sentences. *Johnson v. Franzen*, 77 Ill. 2d 513, 518 (1979); see also *People v. Lindsey*, 199 Ill. 2d 460, 477 (2002) (describing the scheme as a "system of mandatory 'good conduct credit' ").

---

[2]Defendant suggests that the trial court "intended to impose" a *de facto* life sentence without parole in this case because "[t]he law in effect at the time of sentencing required [defendant] to serve 100% of his 76-year sentence. 730 ILCS 5/3-6-3(a)(2)(i) (West 1996)." But we note that the trial court was silent on this issue. And, by the date defendant was sentenced, two appellate court districts had already invalidated the "Truth in Sentencing Law" (730 ILCS 5/3-6-3(a)(2)(ii) (West 1996)), which required 100% service of the sentence, as facially unconstitutional under the single-subject rule. See *People v. Reedy*, 295 Ill. App. 3d 34 (1998); *People v. Pitts*, 295 Ill. App. 3d 182 (1998). This court affirmed that determination in *People v. Reedy*, 186 Ill. 2d 1 (1999). Because the General Assembly did not reenact the Truth in Sentencing Law until after defendant was sentenced, it does not apply to him. Rather, the day-for-day, good-conduct scheme applies. Moreover, the trial court's intent at the time of sentencing is irrelevant because, as noted above, *Montgomery* teaches that a State may satisfy the eighth amendment by providing a juvenile offender an opportunity for release, even if the trial court sentenced the offender to life without parole. 577 U.S. at 212.

¶ 51        This day-for-day credit scheme is designed to encourage rehabilitation and enable an offender to be released after he serves half of the determinate sentence. It allows a predictable, fairly accurate assessment at the time of sentencing of the ultimate length of imprisonment. See Gregory W. O'Reilly, *Truth-in-Sentencing: Illinois Adds Yet Another Layer of "Reform" to Its Complicated Code of Corrections*, 27 Loy. U. Chi. L. J. 985, 993 (1996). Prisoners know that they are "directly accountable for their successes or failures of self-control" and have "a direct stake in maintaining good order and discipline while incarcerated." Robert P. Shuwerk, *Illinois' Experience With Determinate Sentencing: A Critical Reappraisal Part 1: Efforts to Structure the Exercise of Discretion in Bargaining For, Imposing, and Serving Criminal Sentences*, 33 DePaul L. Rev. 631, 637 n.30 (1984). The statutory credit scheme provides prisoners with incentives to " 'conform their behavior to what society will accept.' " *People v. Kolzow*, 319 Ill. App. 3d 673, 679 (2001) (quoting *People v. Burton*, 100 Ill. App. 3d 1021, 1023 (1981)). Thus, an offender sentenced under the statutory scheme providing for day-for-day credit—who conforms his conduct to the prison rules—can demonstrate growth and rehabilitation, thereby procuring his own release after serving half of the judicially imposed prison term. See *People ex rel. Colletti v. Pate*, 31 Ill. 2d 354, 357 (1964) (an inmate is unlawfully imprisoned after serving his maximum sentence less good-conduct credit).

¶ 52        Defendant argues that good-conduct credit is not like parole because obeying prison rules does not demonstrate rehabilitation. We flatly reject that notion. In doing so, we find the decision of the Eleventh Circuit Court of Appeals in *United States v. Mathurin*, 868 F.3d 921 (11th Cir. 2017), to be persuasive. There, a juvenile nonhomicide offender was sentenced to 57 years and 1 month in prison. The *Mathurin* court found that a *de facto* life sentence was not imposed because, although there was no parole under the federal system, the defendant had an opportunity to earn good-conduct credit. *Id.* at 934-36. The court found it "absolutely pivotal" to the inquiry that the defendant "has it within his power to shorten his sentence by earning good-time credit." *Id.* at 934. The court reasoned as follows:

            "It is true that Defendant may not receive all of the above good-time credit if he misbehaves and thereby forfeits some of that credit. But it is totally within Defendant's power to shorten the sentence imposed. *Graham* does not require

that a sentence 'guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.' [Citation.] It just requires that the offender have a chance to show that he has earned the right to be given a second chance at liberty. ***

*** Similar to parole, the ability to earn good-time credit serves this objective by giving the juvenile offender a reason to pursue and exhibit 'maturity and rehabilitation.' " *Id.* at 936 (quoting *Graham*, 560 U.S. at 75).

¶ 53     We likewise find that it is in a defendant's power to shorten his sentence by earning good-conduct credit and that earning such credit allows a defendant the opportunity to exhibit maturity and rehabilitation. The statutory scheme here, which allows for the opportunity of release short of a *de facto* life sentence, is at least on par with discretionary parole for a life sentence, which has specifically been held by the Supreme Court to pass muster under the eighth amendment. See *Montgomery*, 577 U.S. at 212 (a life sentence for a juvenile offender does not violate *Miller* or the eighth amendment if there is a possibility of parole). And our conclusion is consistent with this court's treatment in *Reyes* and *Patterson*, where we took into consideration the juvenile defendants' earliest opportunity for release in assessing whether a *de facto* life sentence had been imposed. See *Reyes*, 2016 IL 119271, ¶ 10 (calculating that the defendant's "earliest opportunity for release" was after serving 89 years of his 97-year sentence, meaning that the 16-year-old offender would remain in prison until at least the age of 105); see also *Patterson*, 2014 IL 115102, ¶ 108 (defendant "was statutorily mandated to serve at least 85% of his total prison term [citation], or 30 years, 7 months," and, although lengthy, sentence was not comparable to life in prison without parole).

¶ 54     Defendant cites three additional reasons why he claims good-conduct credit should be deemed irrelevant: (1) the trial court has no control over the way a defendant's good-conduct credit might be lost, and there is no certainty he will earn it or avoid serving the full sentence imposed; (2) the Department of Corrections can revoke good-conduct credit with "little to no due process afforded"; and (3) complying with prison rules and obtaining good-conduct credit does not show that an offender is ready to reenter society.

¶ 55     We find each of these contentions to be without merit. First, the fact that the trial court has no control over how good-conduct credit is earned or lost is of no moment. Defendant overlooks that a life sentence that provides an opportunity for

- 18 -

parole has that same sort of characteristic. The trial court also has no control over the discretionary decisions made by parole boards. But as noted in *Mathurin*, it is the defendant who has it entirely within his power to shorten his sentence based on good-conduct credit. 868 F.3d at 935. Thus, with the good-conduct system, at least, defendant can control his conduct to impact his ability to earn sentencing credit. In that regard, the statutory scheme providing for good-conduct credit offers much more certainty than parole, which has been described as a system with "few certainties." See *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 8 (1979). Among other things, a parole board considers "whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice." *Id.* Moreover, there is no set of facts that, if shown, dictate a decision in favor of the inmate. *Id.* at 10. A discretionary parole system thus provides no more than "a mere hope" that a benefit will be obtained. *Id.* at 11. And this hope is "not protected by due process." *Id.* All that a State must provide if it establishes a system of parole is an opportunity to be heard and a statement of the reasons for denial of parole. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (*per curiam*). Despite this lack of certainty in the parole system, the Supreme Court has nonetheless held that extending parole eligibility to juvenile offenders satisfies the eighth amendment and that a State may remedy a *Miller* violation by merely permitting the offender to be considered for parole without any resentencing. *Montgomery*, 577 U.S. at 212.

¶ 56    Thus, the above-mentioned principles establish that a statutory scheme providing for good-conduct credit can actually afford *greater* certainty and protection against arbitrariness than a discretionary parole system.

¶ 57    Defendant suggests that consideration of good-conduct credit involves "factual matters"—because a defendant will "likely be unaware how much credit he ultimately will be able to earn"—that are inappropriate for review at the leave to file stage. We find no merit to this argument either. Again, a similar argument could be made about parole: it would always be unknown whether a defendant could persuade a prison review board to grant it. At any rate, the governing factors here are defendant's sentence and the laws surrounding good-conduct credit toward that sentence. It is the *sentencing scheme* that must afford a youthful offender a realistic

opportunity for release. No additional fact finding is necessary, and therefore eligibility for sentencing credit may be considered at the leave to file stage.

¶ 58     Defendant's second contention—that he is provided little to no due process—is also mistaken. As previously noted, defendant is entitled to sentence credit for each day he serves in prison. The good-conduct credit must be awarded and may be revoked only for "specific rule violations." 730 ILCS 5/3-6-3(c) (West 1994). Any decision to revoke such credit must comport with the due process clause because the legislature created a liberty interest in a shortened sentence that results from good-time credits. *Fillmore v. Taylor*, 2019 IL 122626, ¶ 39. Due process requires that a prisoner receive advance written notice of the disciplinary charges, an opportunity to call witnesses and present documentary evidence in defense, and a written statement from the disciplinary board of the evidence relied upon and the reasons for the disciplinary action. *Id.* ¶ 57.

¶ 59     Consistent with these requirements, Illinois law provides for a multistep process before an inmate's good-conduct credit can be revoked. See *Lucas v. Taylor*, 349 Ill. App. 3d 995, 1002 (2004). The procedures established have been found to comport with due process and thus protect against arbitrary revocation of sentence credit. *Id.* at 1000; see also *Rodriguez v. Illinois Prisoner Review Board*, 376 Ill. App. 3d 429, 435 (2007). The Illinois Administrative Code specifically lists, defines, and categorizes all disciplinary offenses based on their seriousness and provides a myriad of due process protections before any credit can be revoked. See 20 Ill. Adm. Code 504. Moreover, the Prisoner Review Board (PRB) provides an extra layer of procedural protection, grievance procedures, and administrative remedies beyond that of the due process clause. See *Rodriguez*, 376 Ill. App. 3d at 437. Then, after pursuing these administrative remedies, an inmate may seek redress in state court for credits lost due to constitutionally infirm disciplinary proceedings. *Fillmore*, 2019 IL 122626, ¶ 67. And if an inmate remains dissatisfied, he may raise the due process claim in a petition for a writ of *habeas corpus* in federal court. *Donelson v. Pfister*, 811 F.3d 911, 915 (7th Cir. 2016). Finally, a prisoner may petition, every three months, for a restoration of revoked credit; the Director may restore up to 30 days of credit at his discretion and more than 30 days with PRB approval. 20 Ill. Adm. Code 107.160 (2019); 730 ILCS 5/3-3-2(b), 3-6-3(c) (West 1994).

¶ 60    From our review of the Illinois good-conduct scheme, it is clear that defendant (1) must be awarded day-for-day credit, (2) is entitled to keep it as long as it is not revoked because he commits a disciplinary offense, (3) is afforded procedures that protect against arbitrary revocation of credit, and (4) may enforce constitutional protections through judicial review. That the Department of Corrections may determine—after adhering to the foregoing due-process procedures—that defendant's misconduct in prison might warrant revocation of previously awarded credit does not alter that the legislature provided him a meaningful opportunity to demonstrate rehabilitation and obtain release before he spends more than 40 years in prison.

¶ 61    Contrary to the dissent's statements, we are neither "awarding" defendant 38 years of credit, nor are we making any factual determinations. We are simply setting forth the sentencing scheme that applies to defendant's sentence. And we believe it undeniable that the ability of defendant to earn day-for-day credit under that scheme presents a "meaningful opportunity" for release from prison short of a *de facto* life sentence.

¶ 62    We also reject defendant's claim that earning good-conduct credit does not demonstrate rehabilitation or show readiness to reenter society. An inmate's behavior in prison tends to be indicative of his or her readiness for release or a harbinger of future recidivism. And it can be evidence that a person has changed and learned to conform his or her conduct to a set of rules. We are not alone in our conclusions. The United States Supreme Court has observed that prison rules are "designed to provide an orderly and reasonably safe prison life." *Wolff v. McDonnell*, 418 U.S. 539, 562 (1974). And the proceedings to ascertain and sanction prison misconduct themselves "play a major role in furthering the institutional goal of modifying the behavior and value systems of prison inmates sufficiently to permit them to live within the law when they are released." *Id.* at 562-63. Thus, the disciplinary process is a "tool to advance the rehabilitative goals of the institution." *Id.* at 563.

¶ 63    Finally, we note that acceptance of defendant's argument focusing solely on the sentence imposed rather than the statutory scheme in its entirety as required by the United States Supreme Court would lead to absurd results and would invalidate or prohibit every sentence imposed on a juvenile offender that is more than 40 years,

regardless of the opportunity to demonstrate rehabilitation and obtain release earlier through the legislatively guaranteed statutory credit. For example, a 16-year-old offender who is sentenced to 41 years with day-for-day credit would be eligible for release after serving 20½ years, at the age of 36 or 37. This can hardly be considered a *de facto* life sentence by any stretch of the imagination. Again, when this court set the mark at more than 40 years in *Buffer*, it relied upon the General Assembly's recent enactment of a minimum 40-year sentence for juveniles convicted of certain murders that would warrant a natural life sentence for an adult. That mandatory-minimum-sentencing scheme referred to in *Buffer* provides no opportunity for good-conduct credit, and *Buffer* is therefore fundamentally different from the present case. Thus, we find that the more-than-40-years mark in *Buffer* is meant to be the line for a *de facto* life sentence where there is no opportunity to demonstrate rehabilitation and obtain release short of serving more than 40 years in prison. In other words, a judicially imposed sentence that is more than 40 years but offers day-for-day, good-conduct sentencing credit does not cross the *Buffer* line if it offers the opportunity to demonstrate maturity and obtain release with 40 years or less of incarceration.

¶ 64    We find, then, that the statutory good-conduct scheme in play here provides defendant "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" before he spends more than 40 years in prison, which this court in *Buffer* determined was the line for a *de facto* life sentence based on an extrapolation from the legislative determination. We therefore hold that defendant's sentence, which offers an opportunity for release after serving 38 years in prison, was not a *de facto* life sentence in violation of the eighth amendment. Accordingly, the appellate court correctly determined that defendant could not satisfy the prejudice prong of the cause-and-prejudice test for bringing a successive postconviction petition with respect to his eighth amendment claim.

¶ 65    We further note that, even if we were to agree with defendant that day-for-day credit should not be factored into whether he received a *de facto* life sentence, the recent United States Supreme Court decision in *Jones* leads us to the same result in this case. In one sentence, the dissent posits that the *Jones* decision does not undermine the policy concerns on which *Miller* was premised. *Infra* ¶ 100. Later, the dissent correctly observes that the mandatory minimum sentence in defendant's case was 32 years. See *infra* ¶ 114. Clearly, the trial court had discretion to consider

defendant's youth and impose less than a *de facto* life sentence. The Supreme Court in *Jones* stated that a sentencing decision imposed under such parameters complies with *Miller*. See *Jones*, 593 U.S. at ___, S. Ct. at 1311, 1322.

¶ 66                                    III. *Proportionate Penalties Clause*

¶ 67        Defendant argues that, even if this court allows consideration of statutory sentencing credit under the eighth amendment of the federal constitution, defendant's sentence nonetheless violates the proportionate penalties clause of the Illinois Constitution. In support of his argument, defendant relies upon the special status of children at sentencing recognized by *Miller* and Illinois's long-standing recognition of that special status (see, *e.g.*, *People v. Miller*, 202 Ill. 2d 328, 340-43 (2002); *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894)).

¶ 68        The State in response argues that defendant cannot establish cause for bringing this claim because, relative to the instant successive postconviction proceeding, he raises the claim for the first time before this court and it is therefore forfeited. The State also argues that the claim is barred by the doctrine of *res judicata*.

¶ 69        We agree that the claim is forfeited and also barred by the doctrine of *res judicata*. Defendant did not raise the proportionate penalties argument in his petition for leave to file a successive postconviction petition or in the petition itself, nor did he raise it in his briefs before the appellate court on appeal from denial of leave to file his successive petition or in his petition for leave to appeal to this court. It is therefore forfeited. *People v. Robinson*, 223 Ill. 2d 165, 173-74 (2006) (issue not raised in posttrial motion or in appeal before appellate court or in petition for leave to appeal to this court is forfeited and will not be considered); *People v. Jones*, 213 Ill. 2d 498, 505 (2004) (claim not raised in postconviction petition itself cannot be raised on appeal).

¶ 70        Defendant asserts that he raised the proportionate penalties claim in his opening brief in the appellate court on appeal from denial of his successive petition. But defendant is mistaken. He made no argument in his briefs before the appellate court that could be characterized as based on the proportionate penalties clause. Instead,

in the middle of his 11-page, eighth-amendment argument, he merely made a one-sentence reference to the clause and cited the Illinois Constitution.

¶ 71   The dissent claims that we have "mischaracterize[d]" defendant's appellate court argument. But there is no portion of defendant's appellate court brief that was expressly captioned to signal that defendant was raising a proportionate penalties claim. And, again, all the arguments made in his brief were made in connection with his general argument that his sentence violated the eighth amendment under *Miller*. Defendant therefore forfeited the proportionate penalties claim by not raising it. And the State does not forfeit the right to raise a forfeiture argument before this court where the defendant fails to clearly and plainly establish that he is raising the issue in the appellate court that the State now claims is forfeited. Nor was the State required to argue below that the proportionate penalties claim was precluded by the doctrine of *res judicata*, where defendant did not clearly specify in his appellate court brief that he was raising a proportionate penalties claim.

¶ 72   We also find that defendant's penalties-clause claim is barred on the alternate ground of *res judicata* because, on direct appeal following his conviction in 1998, defendant raised a proportionate penalties claim there, arguing that the trial court failed to adequately consider his age and rehabilitative potential. The appellate court rejected that proportionate penalties argument on direct appeal. *People v. Dorsey*, 315 Ill. App. 3d 1219 (2000) (table) (unpublished order under Illinois Supreme Court Rule 23). Accordingly, defendant's claim is barred by *res judicata*. See *Davis*, 2014 IL 115595, ¶¶ 4-5, 42-45 (holding that Illinois law recognized the "special status of juvenile offenders" before *Miller* and *res judicata* therefore barred relitigation of juvenile offender's challenge to sentence under proportionate penalties provision of Illinois Constitution, even though *Miller* was not decided until 2012, which was many years after the 1995 appellate court decision that resolved the juvenile's penalties claim on direct appeal).

¶ 73   Moreover, we find that *Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause. See *Patterson*, 2014 IL 115102, ¶ 97 ("A ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision."). As defendant acknowledges, Illinois courts have long recognized the differences between persons of mature age

and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of "some helpful support" for his state constitutional law claim, which is insufficient to establish "cause." See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59. And, of course, *Miller*'s unavailability does nothing to explain why in this successive postconviction proceeding defendant neglected to raise the proportionate penalties clause claim below, waiting to raise it instead for the first time before this court.

¶ 74                                              CONCLUSION

¶ 75        For the reasons we have stated, we affirm the judgment of the appellate court, which affirmed the decision of the trial court to deny defendant's motion for leave to file a successive postconviction petition due to his failure to satisfy the cause-and-prejudice test.

¶ 76        Affirmed.

¶ 77        JUSTICE NEVILLE, dissenting:

¶ 78        My colleagues in the majority hold that day-for-day, good-conduct sentence credit is relevant in determining whether a court-imposed prison sentence for a juvenile offender reaches the 40-year threshold for a *de facto* life sentence in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327. *Supra* ¶¶ 50-53. Moreover, the majority accepts the State's word that, if defendant is awarded day-for-day, good-conduct sentence credit, it will lower his sentence to 38 years, which is below the threshold for a *de facto* life sentence. *Supra* ¶ 64. Accordingly, the majority holds that defendant has not demonstrated the requisite prejudice to file a successive postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)). *Supra* ¶¶ 63-64. In addition, the majority refuses to address defendant's alternative claim that his 76-year sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), based alternatively on forfeiture and *res judicata*. *Supra* ¶¶ 66-73.

¶ 79    I respectfully disagree. First, I would hold that the availability of day-for-day, good-conduct sentence credit is a factual determination which cannot be made at the pleading stage when reviewing a successive postconviction petition to determine whether a court-imposed prison sentence for a juvenile offender reaches the 40-year threshold for a *de facto* life sentence. Therefore, at the pleading stage, I would hold that defendant has adequately alleged that the court-imposed, 76-year sentence constitutes a *de facto* life sentence pursuant to *Buffer*. Second, I would also hold that defendant has made a *prima facie* showing that his court-imposed, 76-year sentence violates the proportionate penalties clause of the Illinois Constitution. Thus, I would grant defendant's requested relief and remand the case to the trial court for second stage postconviction proceedings. Accordingly, I respectfully dissent.

¶ 80                              I. BACKGROUND

¶ 81    Following a 1998 jury trial in the circuit court of Cook County, defendant, Derrell Dorsey, was convicted of one count of first degree murder and two counts of attempted first degree murder. Defendant was 14 years old at the time of the offenses. The trial court sentenced defendant to a discretionary sentence of 76 years' imprisonment. In 2014, defendant filed the current petition for leave to file a successive petition for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant asserted that his 76-year prison sentence constituted a *de facto* life sentence in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII), pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012).

¶ 82    Defendant attached several affidavits and documents in support of his arguments. Defendant attached portions of transcripts from his juvenile transfer hearing that included testimony he argued should have been considered in mitigation at sentencing. Specifically, defendant attached the testimony of probation officer Tom Ortega indicating he believed defendant should not have been tried as an adult where it would deprive him of the opportunity to benefit from juvenile services he had not yet received, such as residential placement and intensive therapy and counseling. Defendant also attached testimony from psychiatrist Dr. Daniel Schiff indicating defendant had better than average

- 26 -

intellectual ability and capacity for empathy. Dr. Schiff further testified that defendant had expressed remorse about his troubles in school having brought discomfort to his grandmother and expressed his belief that defendant would benefit from education and therapy. Defendant attached testimony from psychologist Dr. John Murray indicating defendant was amenable to treatment or intervention and that he was vulnerable to manipulation and exploitation by more sophisticated people, such as older members of a street gang. Defendant also attached certificates showing he had earned his GED while in prison and completed two college-level courses and several therapeutic courses.

¶ 83     The circuit court denied defendant leave to file a successive postconviction petition. In November 2017, the appellate court affirmed the circuit court. 2016 IL App (1st) 151124-U.

¶ 84     Before the appellate court, defendant acknowledged that, based on day-for-day, good-conduct sentence credit, he might actually serve only 38 years of his aggregate 76-year sentence. However, defendant asked the appellate court to find that his sentence was nevertheless a *de facto* life sentence because there is no guarantee that he will receive day-for-day credit. *Id.* ¶ 28. The appellate court concluded that any sentencing credit that is available to the defendant, with his scheduled release date, is relevant and should be accounted for in determining whether a sentence is a *de facto* life sentence. *Id.* ¶ 29. Considering defendant's eligibility for day-for-day, good-conduct sentence credit, the appellate court held that defendant's 76-year prison term did not constitute a *de facto* life sentence. *Id.* ¶ 37.

¶ 85     In 2019, this court held that a prison sentence of 40 years or more imposed by a circuit court on a juvenile offender constitutes a *de facto* life sentence in violation of the eighth amendment. *Buffer*, 2019 IL 122327, ¶¶ 41-42.

¶ 86                                   II. ANALYSIS

¶ 87                                    A. Standard of Review

¶ 88        "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*." *People v. Bailey*, 2017 IL 121450, ¶ 13. This court has recognized that successive postconviction petitions are typically filed *pro se* and that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)) does not provide for a defendant to be entitled to counsel until after a postconviction petition is docketed. *Bailey*, 2017 IL 121450, ¶ 27. In *Bailey*, this court explained as follows:

> "[T]he Act contemplates an independent determination by the circuit court. The motion for leave to file is directed to the court, and it is the court that must decide the legal question of whether a defendant has satisfied the section 122-1(f) requirement of showing cause and prejudice. This is a preliminary screening to determine whether defendant's *pro se* motion for leave to file a successive postconviction petition adequately alleges facts demonstrating cause and prejudice. [Citation.] In other words, the court must determine whether defendant has made a *prima facie* showing of cause and prejudice. If the defendant has done so, the court will grant leave for the petition to be filed." *Id.* ¶ 24.

> Satisfying the cause and prejudice requirement does not entitle the defendant to relief but, rather, only gives the defendant an avenue for filing a successive postconviction petition. *Id.* ¶ 25. The petition then "advances to the three-stage process for evaluating postconviction petitions." *Id.* ¶ 26. "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *People v. Robinson*, 2020 IL 123849, ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.*

¶ 89        Both the trial and appellate courts found that defendant established the postconviction element of cause for failing to raise his eighth amendment claim sooner. Before this court, the State correctly concedes that defendant established the element of cause.

¶ 90                              B. Day-for-Day Credit Irrelevant in
                                     *De Facto* Life Sentence Determination at
                                     Postconviction Pleading Stage

¶ 91        Before this court, defendant maintains his contention that day-for-day, good-conduct sentence credit is irrelevant in determining whether a sentence is a *de facto* life sentence. Defendant asks us to establish a bright-line rule that day-for-day, good-conduct sentence credit should not be considered at the leave to file pleading stage of successive postconviction proceedings. Defendant argues that, pursuant to the 40-year line established in *Buffer*, his 76-year sentence is a *de facto* life sentence.

¶ 92        The State counters that the availability of day-for-day, good-conduct sentence credit must be considered. This is not the first case in which the State has raised this argument. In *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 15, the State argued that a court should consider a defendant's available day-for-day, good-conduct sentence credit in determining whether the defendant's sentence is a *de facto* life sentence. The appellate court rejected this argument and focused its analysis on the sentence actually imposed. *Id.* ¶¶ 18-20. The State has repeatedly asserted this argument in the appellate court, where it was repeatedly rejected. *People v. Thornton*, 2020 IL App (1st) 170677, ¶¶ 18-22; *People v. Daniel*, 2020 IL App (1st) 172267, ¶¶ 8, 22-26; *People v. Figueroa*, 2020 IL App (1st) 172390, ¶¶ 25-35 ("the State again argues that *Peacock* was wrongly decided," and "we adhere to *Peacock* and *Thornton*"); *People v. Quezada*, 2020 IL App (1st) 170532, ¶¶ 13-17 ("the State argues that *Peacock* was wrongly decided," and "[w]e decline to depart from our holding in *Peacock*"); *People v. Hill*, 2020 IL App (1st) 171739, ¶¶ 3, 33-41; *People v. Simental*, 2021 IL App (2d) 190649, ¶¶ 11, 16-20 ("[t]he State argues that we should decline to follow *Peacock* and *Thornton*," and "[w]e agree with the reasoning of *Thornton* and *Peacock*, as well as the more recent cases of *Daniel* and *Hill*"); *People v. Ruiz*, 2021 IL App (1st) 182401, ¶¶ 64-70. In addition to these published opinions, the appellate court has repeatedly rejected the State's argument in unpublished orders pursuant to Illinois Supreme Court Rule 23. See *People v. Meneses*, 2021 IL App (1st) 191247-U, ¶¶ 5, 16; *People v. Morfin*, 2020 IL App (1st) 172268-U, ¶¶ 30-34; *People v. Hood*, 2020 IL App (1st) 171645-U, ¶¶ 34-37; *People v. Spaulding*, 2020 IL App (1st) 172269-U, ¶¶ 25-28; *People*

*v. Anderson*, 2020 IL App (1st) 172583-U, ¶¶ 19-24; *People v. Ruddock*, 2020 IL App (1st) 173023-U, ¶¶ 62, 65-67.

¶ 93 However, in this court, my colleagues in the majority now accept the State's day-for-day, good-conduct sentence credit argument, which so many of their fellow judges have rejected. The majority mischaracterizes this significant body of case law. As I write this dissent, the appellate court has issued eight reported opinions and six unpublished orders that rejected the State's argument.

¶ 94 Now I turn to the factual determinations made by the majority at the pleading stage when reviewing defendant's successive postconviction petition. At the time of defendant's offenses, section 3-6-3(a) of the Unified Code of Corrections provided that the Illinois Department of Corrections (IDOC) prescribe rules and regulations for the early release of prisoners based on good conduct. 730 ILCS 5/3-6-3(a) (West 1994). The statute specifically required the rules and regulations to provide that "the prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court." *Id.* § 3-6-3(a)(2). The statute further provides: "The Department shall prescribe rules and regulations for revoking good conduct credit, or suspending or reducing the rate of accumulation thereof for specific rule violations, during imprisonment." *Id.* § 3-6-3(c).

¶ 95 Despite the apparent certainty of an inmate's *receipt* of day-for-day, good-conduct sentence credit, courts have recognized that an inmate's *retention* of day-for-day, good-conduct sentence credit is certainly not guaranteed. The United States Supreme Court has recognized as follows:

> "An award of good time credit by the Bureau of Prisons (BOP) does not affect the length of a court-imposed sentence; rather, it is an administrative reward to provide an incentive for prisoners to compl[y] with institutional disciplinary regulations. [Citation.] Such credits may be revoked at any time before the date of a prisoner's release." (Internal quotation marks omitted.) *Pepper v. United States*, 562 U.S. 476, 501 n.14 (2011).

This court has recognized as follows: "Good time, although a part of every sentence, is a conditional right which may be forfeited prior to the time a convict is

entitled to discharge ***." *People ex rel. Colletti v. Pate*, 31 Ill. 2d 354, 357 (1964). Our appellate court has repeatedly recognized that section 3-6-3(c) of the Unified Code of Corrections directs IDOC to promulgate rules and regulations for the revocation of day-for-day, good-conduct sentence credit and for the suspension or reduction of good-conduct sentence credit accumulation for specific rule violations. "Thus, it is a prisoner's behavior while imprisoned that determines the amount, if any, of good-conduct credit that will be applied to his sentence." *People v. Castano*, 392 Ill. App. 3d 956, 960 (2009). Since IDOC has the right to revoke good-conduct credit for disciplinary infractions, an inmate's right to have those credits applied to his sentence is contingent upon his or her good behavior while in prison. *Johnson v. Illinois Department of Corrections*, 368 Ill. App. 3d 147, 152 (2006).

¶ 96        IDOC has published a list of correctional infractions that can result in possible revocation of day-for-day, good-conduct sentence credit. Although IDOC may not revoke good-conduct sentence credit arbitrarily, the list of infractions is sufficiently broad to be viewed as arbitrary. First, infractions with one-month penalties include unauthorized movement; petitions, postings, and business ventures; health, smoking, or safety violations; failure to report; or violation of rules. Second, infractions that may subject an inmate to a good-conduct sentence credit revocation of three months include gambling, insolence, abuse of privileges, possession of money or unauthorized property, and transfer of funds. Third, infractions punished by six-month, good-conduct sentence credit revocations include associating with groups constituting a "security threat" or unauthorized organizational activity, dangerous communications, dangerous written materials, filing a frivolous lawsuit, failure to reveal assets, or disobeying a direct order. 20 Ill. Adm. Code 504.Appendix A (2017); 20 Ill. Adm. Code 504.Table A (2017) ("Maximum Penalties") (cited in *Hill*, 2020 IL App (1st) 171739, ¶¶ 39, 55, and *Figueroa*, 2020 IL App (1st) 172390, ¶ 31).

¶ 97        These regulations confirm that IDOC, not the trial court, has the last word on the actual amount of time served. The separation of powers clause of the Illinois Constitution provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. The power to impose criminal sentences is inherently a judicial function. In contrast, the legislature has the exclusive power to enact legislation that provides for a penological system and provides rules and regulations

for the discipline of inmates. In a legal sense, day-for-day, good-conduct sentence credit, which is a legislatively imposed postsentence adjustment, does not diminish a judicially imposed sentence or in any way affect it. See *Pepper*, 562 U.S. at 501 n.14 (recognizing that an award of good time credit "may be revoked at any time before the date of a prisoner's release" and "does not affect the length of a court-imposed sentence"); *People v. Williams*, 66 Ill. 2d 179, 186-87 (1977). For example, in *Bear Cloud v. State*, 2014 WY 113, 334 P.3d 132, the juvenile defendant was sentenced to consecutive sentences totaling 45 years. An issue raised for review was whether the defendant's aggregate 45-year sentence constituted a *de facto* life sentence that was imposed without compliance with the eighth amendment and *Miller v. Alabama*. The Wyoming Supreme Court noted that, with good time credit, the defendant "might be eligible for release after 35 years." *Id.* ¶ 11 n.3. However, citing the United States Supreme Court's decision in *Pepper*, the court did not rely on the good-time potential in its analysis. *Id.*

¶ 98    Accordingly, in determining whether a sentence is a *de facto* life sentence at the pleading stage when reviewing a successive postconviction petition, a court can only consider facts alleged in defendant's petition—in this case the actual 76-year sentence that the court imposed. The court should not consider facts not alleged in the petition, including speculative and conditional postsentence legislative adjustments to the court's actual sentence, which the majority alleges to be 38 years, until the third stage evidentiary hearing.

¶ 99    It is axiomatic that day-for-day, good-conduct sentence credit is conditional and constitutes only a mere possibility of an earlier release. See, *e.g.*, *Peacock*, 2019 IL App (1st) 170308, ¶ 19. The above-listed IDOC disciplinary infractions make clear that an inmate can lose good-conduct credit for many different correctional infractions that may have little bearing on whether he has matured to the point of being able to safely reenter and contribute to society. However, for a juvenile offender like defendant, who was sentenced to a term of 76 years in prison, any hope of obtaining release in 40 years or less will depend on his ability to maintain a near-perfect disciplinary record.

¶ 100    I conclude that the "mere possibility" that defendant may retain enough day-for-day, good-conduct sentence credit to complete his sentence after serving 38 years is not the type of meaningful opportunity for release based on demonstrated

maturity and rehabilitation that *Miller v. Alabama* envisioned. Moreover, the United States Supreme Court's decision in *Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021), does not undermine the policy concerns on which *Miller* was premised.

¶ 101    Further, the majority points to *People v. Patterson*, 2014 IL 115102, and *People v. Reyes*, 2016 IL 119271 (*per curiam*), in which this court mentioned juvenile offenders' eligibility to earn good-conduct credit when determining whether their term-of-years sentences were *de facto* life sentences. *Supra* ¶¶ 42-44, 53.

¶ 102    The majority's reliance on these decisions is misplaced. In *Reyes*, the defendant was sentenced to a term of 97 years in prison. 2016 IL 119271, ¶ 2. This court noted that the defendant would be required to serve at least 89 years before becoming eligible for release. *Id.* Because the sentence "mandated that [the defendant] remain in prison until at least the age of 105," this court deemed it the functional equivalent of life without parole and thus a *de facto* life sentence. *Id.* ¶¶ 9-10. However, while we emphasized the number of years the defendant would be required to serve with available good-conduct credits rather than the length of his sentence as imposed, we did not squarely address which figure was determinative under *Miller v. Alabama*. Because the defendant's sentence was equivalent to life without parole under any measure, I do not read *Reyes* as answering the question presented here.

¶ 103    Nor does *Patterson* support the majority. The defendant there was sentenced to 36 years in prison for offenses committed as a juvenile but would be eligible for release after serving a little more than 30.5 years if he earned all available good-conduct credit. *Patterson*, 2014 IL 115102, ¶ 108. Although this court noted the number of years the defendant would be required to serve before becoming eligible for release, we ultimately concluded that the 36-year term itself did not fall into the category of "the most severe of all criminal penalties" governed by *Miller v. Alabama*. *Id.* ¶ 110.

¶ 104    The majority avoids subjecting this *de facto* life sentence to eighth amendment scrutiny at the pleading stage of this postconviction proceeding by speculating on defendant's good conduct and by awarding defendant 38 years of day-for-day, good-conduct sentence credit before he actually earns or retains it. I respectfully disagree. By awarding defendant 38 years of day-for-day, good-conduct sentence credit, the majority is making a factual determination that a court is precluded from

- 33 -

making at the leave to file pleading stage when reviewing a successive postconviction petition. See *Robinson*, 2020 IL 123849, ¶ 45. Therefore, at the pleading stage, I would hold that defendant's court-imposed, 76-year sentence constitutes a *de facto* life sentence because it exceeds the 40-year threshold established in *Buffer*.

¶ 105          C. Defendant's 76-Year Sentence Violates the
Proportionate Penalties Clause of the Illinois Constitution

¶ 106     Defendant alternatively contends that, even if his available good-conduct credit is considered, his lengthy sentence nevertheless violates the proportionate penalties clause of the Illinois Constitution, which guarantees in pertinent part: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The proportionate penalties clause, which expressly includes the objective of rehabilitation, goes "beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v. Clemons*, 2012 IL 107821, ¶ 40.

¶ 107          1. Defendant Made *Prima Facie* Showing of Cause

¶ 108     Defendant requests that the case be remanded to the trial court for further postconviction proceedings. The State initially responds that defendant failed to establish the element of cause required to file a successive postconviction petition. The State argues that (1) defendant forfeited his proportionate penalties contention by failing to raise it sooner and (2) defendant did raise this contention previously and, therefore, is barred by the doctrine of *res judicata*. The majority accepts the State's incorrect argument in its entirety. *Supra* ¶¶ 66-73. The State's response is incorrect, and the majority errs by accepting the State's incorrect argument wholesale.

¶ 109     First, the majority concludes that defendant forfeited his proportionate penalties argument because he failed to raise it in his petition for leave to file a successive postconviction petition or in the petition itself or in his briefs before the appellate court. *Supra* ¶ 69. The majority states that, before the appellate court, defendant

- 34 -

"merely made a one-sentence reference to the [proportionate penalties] clause and cited the Illinois Constitution." *Supra* ¶ 71.

¶ 110    I respectfully disagree. This court routinely addresses arguments in the face of procedural irregularities that would otherwise render the claims defaulted. See *People v. McCarty*, 223 Ill. 2d 109, 141-42 (2006) (reaching search warrant specificity argument despite the fact that the issue was not contained in the petition for leave to appeal); *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 214 Ill. 2d 417 (2005) (allowing petition for leave to appeal to stand despite failure to comply with Illinois Supreme Court Rule 315 (eff. Oct. 1, 1997)). Defendant requests that the Illinois Supreme Court exercise its power by reviewing his 76-year sentence for a crime committed when he was 14 years old. The circuit court exercised its power and imposed a sentence that deprived defendant of his liberty for 76 years. The deprivation of defendant's liberty for 76 years is too important an issue for the supreme court, through judicial nonfeasance, to abdicate its power of review by invoking the forfeiture doctrine to avoid deciding defendant's postconviction proportional penalties claim on the merits.

¶ 111    The majority, to avoid addressing the merits, mischaracterizes defendant's appellate court argument. In his appellant's brief, after expressly referencing and citing to the proportionate penalties clause, defendant clearly argued that a minimum 38-year sentence was "constitutionally disproportionate" as applied to him. Defendant pointed to several facts indicating his potential for rehabilitation. Defendant argued:

> "If Dorsey were released at a younger age, he would have a good chance of being restored to useful citizenship. But if Dorsey is released in 2034 as planned, he will have missed many opportunities at rehabilitation and education, making it less likely he will become a productive member of society. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 74 (holding that, given the defendant's rehabilitative potential, his 52-year minimum sentence 'seems more consistent with eliminating his utility as a citizen')."

The parenthetical language in *Gipson*, which defendant cited in his appellant's brief, occurs in that portion of the court's analysis expressly captioned "The Proportionate Penalties Clause." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 68.

Defendant *did* raise his proportionate penalties claim before the appellate court, and the majority errs in denying that fact.

¶ 112    Second, the majority concludes that defendant's proportionate penalties claim is barred by the doctrine of *res judicata* because he raised it on direct appeal from his conviction and the appellate court rejected it. *Supra* ¶ 72 (citing *People v. Dorsey*, 315 Ill. App. 3d 1219 (2000) (table) (unpublished order under Illinois Supreme Court Rule 23)). However, the State failed to raise *res judicata* in the appellate court in response to defendant's proportionate penalties argument. The doctrine of forfeiture applies equally to the State as well as to the defendant. *People v. McKown*, 236 Ill. 2d 278, 308 (2010). Therefore, the State forfeited its argument that defendant's proportionate penalties claim is barred by the doctrine of *res judicata*. I would hold that defendant made a *prima facie* showing of cause required to file a successive postconviction petition.

¶ 113                    2. Defendant Made *Prima Facie* Showing of Prejudice

¶ 114    Turning to the postconviction element of prejudice, defendant was subject to a statutory minimum aggregate sentence of 32 years on one count of first degree murder and two counts of attempted first degree murder. See 730 ILCS 5/5-8-1(a)(1)(a) (West 1994) (minimum sentence for first degree murder is 20 years); 720 ILCS 5/8-4(c)(1) (West 1994), 730 ILCS 5/5-8-1(a)(3) (West 1994) (minimum sentence for attempted first degree murder is 6 years). While defendant was subject to a 32-year mandatory minimum sentence, the trial judge imposed a 76-year *de facto* life sentence.

¶ 115    Defendant maintains that, even if he receives all of his available day-for-day, good-conduct sentence credit, he would be released from prison in September 2034, when he will be 53 years old. Defendant argues that this sentence will have him behind bars for at least most of his life for an offense committed when he was 14 years old. Defendant contends that the lower courts failed to properly weigh and apply the unique mitigating circumstances of his case, including his potential for rehabilitation.

¶ 116    As earlier stated, the proportionate penalties clause of the Illinois Constitution guarantees in pertinent part: "All penalties shall be determined both according to

the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This constitutional mandate provides a check on the individual sentencing judge and the legislature. A trial court may not impose a sentence that is unconstitutionally disproportionate for an individual defendant although the sentence is within a sentencing range, and the legislature may not enact a mandatory minimum sentence that is unconstitutionally disproportionate for an individual defendant. *Clemons*, 2012 IL 107821, ¶ 30; *People v. Harris*, 2018 IL 121932, ¶ 68 (Burke, J., specially concurring).

¶ 117    The proportionate penalties clause requires a court to consider the circumstances of the offense and the character of the defendant. A sentence does not offend the constitutional requirement of proportionality if it is commensurate with the seriousness of the crime and adequately considers the rehabilitative potential of the defendant. *People v. St. Pierre*, 146 Ill. 2d 494, 513 (1992) (and cases cited therein). "Although the seriousness of a defendant's conduct may in many cases outweigh mitigating factors regarding a particular defendant, it does not follow that a defendant's personal characteristics are irrelevant." *Gipson*, 2015 IL App (1st) 122451, ¶ 72. Rather, "the proportionate penalties clause demands consideration of the defendant's character by sentencing a defendant with the objective of restoring the defendant to useful citizenship, an objective that is much broader than defendant's past conduct in committing the offense." *Id.*; see *People v. Kane*, 31 Ill. App. 3d 500, 512 (1975) (viewing the proportionate penalties clause "as imposing a constitutional requirement that rehabilitative potential be considered in setting sentences").

¶ 118    To succeed on a proportionate penalties clause claim, a defendant must demonstrate, pertinent here, that "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). In *Leon Miller*, this court explained that we had never defined cruel, degrading, or shockingly disproportionate punishment "because, as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. A court reviews "the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 119    I would hold that defendant made a *prima facie* showing of prejudice required for filing a successive postconviction petition. The Illinois General Assembly has significantly changed our sentencing statutes for defendants under the age of 18 when they committed their offenses. Trial courts must now approach juvenile sentencing hearings through a completely different lens. The increasing protections for young offenders enacted by the Illinois legislature further highlight the disproportionate nature of defendant's sentence in violation of the proportionate penalties clause.

¶ 120    Today, a juvenile would be entitled to a parole hearing after 20 years (730 ILCS 5/5-4.5-115(b) (West 2020)), about 18 years before defendant's earliest opportunity for release at age 53 based on the possibility of statutory sentencing credit. As the United States Supreme Court has recognized: "It is important that we not overlook the ultimate purpose of parole[,] which is a component of the long-range objective of rehabilitation." *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 13 (1979). Unlike day-for-day credit, the purpose of parole "is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). A parole hearing is designed to determine when an incarcerated individual actually has been rehabilitated. *Kane*, 31 Ill. App. 3d at 513. Today, a juvenile offender would have an opportunity for a second parole hearing after another 10 years (730 ILCS 5/5-4.5-115(m) (West 2020)), giving the juvenile two opportunities to demonstrate rehabilitation during his first 30 years in prison.

¶ 121    However, defendant will never have an opportunity to obtain early release based on demonstrated rehabilitation. While defendant's eligibility for day-for-day credit provides some possibility of release after 38 years, this possibility is entirely unrelated to his rehabilitative progress.

¶ 122    It is fundamentally unfair that defendant has no opportunity for early release based on demonstrated rehabilitation. The record shows that defendant obtained his GED in prison, successfully completed several college-level courses in prison, and participated in counseling and mentoring sessions. He received a certificate of achievement for participation in the Black History Bowl Contest and a certificate

of excellence for being the quarter-final winner. The record demonstrates defendant's rehabilitative efforts and his capability for intellectual achievement.

¶ 123    If defendant is denied an opportunity for early release based on demonstrated rehabilitation, he will have missed additional opportunities at rehabilitation and education, making it less likely he will become a productive member of society if he ever obtains release. Where defendant's sentence offers no meaningful incentive of restoration to useful citizenship, it "seems more consistent with eliminating his utility as a citizen." See *Gipson*, 2015 IL App (1st) 122451, ¶ 74. Illinois courts have recognized that "long periods of confinement have little, if any, value in a rehabilitative strategy." *People v. Kosanovich*, 69 Ill. App. 3d 748, 752 (1979). In other words, excessive sentences threaten to " 'defeat the effectiveness of the parole system by making mandatory the incarceration of a prisoner long after effective rehabilitation has been accomplished.' " *People v. Roddy*, 9 Ill. App. 3d 65, 66 (1972) (quoting *People v. Lillie*, 79 Ill. App. 2d 174, 179 (1967)).

¶ 124    Additionally, scholars have recognized the reality that lengthy prison sentences can be counterproductive to rehabilitation. " 'The evidence is what's known as the age-crime curve. It shows that people tend to age out of crime. In their mid-to-late teens and early 20s, people are much, much likelier to commit a crime than they are in their 30s and especially 40s and on.' " *People v. Lusby*, 2020 IL 124046, ¶ 141 (Neville, J., dissenting upon denial of rehearing) (quoting German Lopez, *The Case for Capping All Prison Sentences at 20 Years*, Vox (Feb. 12, 2019), https://www.vox.com/future-perfect/2019/2/12/18184070/maximum-prison-sentence-cap-mass-incarceration [https://perma.cc/N7X3-LSZN]). Accordingly, scholars have opined as follows:

" 'Knowing that most young people 'age out' of crime by their mid- to late-20s, it is counterproductive to subject them to an often-brutal prison environment. Yes, there need to be consequences for criminal behavior, but these should involve finding the appropriate balance between public safety and helping offenders address the factors that contributed to their crimes.' " *Id.* (quoting *What We Can Learn From the Amazing Drop in Juvenile Incarceration*, Ashley Nellis & Marc Mauer, The Marshall Project, Jan. 24, 2017, https://www.the marshallproject.org/2017/01/24/what-we-can-learn-from-the-amazing-drop-in-juvenile-incarceration) [https://perma.cc/GB49-7289]).

¶ 125    While there may be cases where a harsh term-of-years is an appropriate sentence for a juvenile offender, I would hold that defendant adequately alleged that the application of this extreme penalty to defendant is unconstitutionally disproportionate. Because defendant's sentence is unconstitutionally disproportionate and because he has pled facts that establish the disproportionality of his sentence, he has made a *prima facie* showing of prejudice for purposes of filing a successive petition.

¶ 126                              III. CONCLUSION

¶ 127    The majority's failure to comply with Illinois Supreme Court postconviction pleading rules will confuse lower courts. See *Robinson*, 2020 IL 123849, ¶ 45. The majority speculates that defendant will receive 38 years of day-for-day, good-conduct sentence credit, but the 38 years of sentence credit is speculation about a fact not pled in defendant's successive postconviction petition. Therefore, the majority cannot consider the speculative 38-year sentence credit when it reviews the denial of defendant's successive postconviction petition at the pleading stage.

¶ 128    In addition, I disagree with the majority's refusal to address defendant's alternative challenge based on the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). I would hold that defendant has made a *prima facie* showing that his 76-year sentence is unconstitutionally disproportionate. I would also hold that defendant satisfies the prejudice requirement for filing a successive postconviction petition. Finally, I would reverse the judgment of the appellate court, which upheld the denial of defendant's petition for leave to file a successive postconviction petition, I would grant defendant's requested relief, and I would remand the case to the trial court for further second stage postconviction proceedings.

¶ 129    Accordingly, I respectfully dissent.