2022 IL App (1st) 171645-UB

FIFTH DIVISION
February 4, 2022

No. 1-17-1645

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 96 CR 5317 |
| | ) | |
| RONALD HOOD, | ) | Honorable Stanley J. Sacks, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Cunningham and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's 60-year sentence, with eligibility for day-for-day good-conduct credit, did not amount to a *de facto* life sentence; the trial court properly considered all *Miller* factors in resentencing defendant; affirmed.

¶ 2    Pursuant to the supervisory order issued by the Illinois Supreme Court in *People v. Hood*, No.126546 (Nov. 24, 2021), we vacated our previous order and now reconsider our decision in light of *People v. Dorsey*, 2021 IL 123010.

¶ 3    Defendant, Ronald Hood, was convicted in 1997 of two counts of first degree murder and two counts of attempted armed robbery in connection with the shooting deaths of Malinda Gavin

and Ray Bowen. Defendant was 16 years old at the time of the crimes and was sentenced to mandatory life in prison for the murder convictions and 15 years' imprisonment for the attempted armed robbery convictions. In June 2013, defendant filed a *pro se* postconviction petition, alleging that his natural life imprisonment sentence violated *Miller v. Alabama*, 567 U.S. 460 (2012). *Miller* held that the imposition of a mandatory term of natural life imprisonment without the possibility of parole on a juvenile convicted of homicide violated the eighth amendment's prohibition against cruel and unusual punishment. The circuit court granted defendant a new sentencing hearing. Following the new sentencing hearing, defendant was sentenced to concurrent terms of 60 years' imprisonment for each murder. The trial court denied defendant's motion to reconsider the sentence, and this appeal follows. For the reasons below, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5      The evidence presented at defendant's bench trial showed that on August 29, 1994, the victims, Gavin and Bowen, were in a parked car, naked from the waist down. Defendant walked past the car with his friends. One of the friends suggested they "fuck with" the people inside. Another friend asked defendant if he was scared and then handed him a gun. Defendant approached the vehicle with his friend and codefendant, Anthony Spaulding, who demanded money from Bowen. When Bowen refused, Spaulding fired shots into the car. Defendant also fired shots into the car, shooting twice into the driver's side window. Both Gavin and Bowen were killed.

¶ 6      Defendant was found guilty of the two murders and two counts of attempted robbery. He received a mandatory sentence of natural life in prison under the multiple-murder provision of

2

the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c) (West 1994)), and a concurrent 15-year prison sentence for the attempted robbery convictions.

¶ 7     In 2012, the United States Supreme Court decided *Miller*, which held that the eighth amendment prohibits mandatory sentences of life in prison without the possibility of parole for juvenile homicide offenders. 567 U.S. at 479. Subsequently, defendant filed a *pro se* successive postconviction petition challenging his sentence of natural life in prison under *Miller*.  The trial court granted defendant a new sentencing hearing to consider *Miller*.

¶ 8     On May 18, 2017, the new sentencing hearing was held with the same judge that sentenced defendant and codefendant in 1997. At the hearing, Dr. James Garbarino, a psychologist, testified that he interviewed defendant twice (February 15, 2016, and June 20, 2016), looked at the information in defendant's social history, and wrote up a final report. Dr. Garbarino testified that he spent about four hours with defendant and reviewed records including a letter from defendant's GED instructor, transcripts from the original trial, and Illinois Department of Corrections (IDOC) records.

¶ 9     Dr. Garbarino testified that he used the factors from the *Miller* decision as the organizing framework for generating his report. He testified that defendant was 16 years old at the time of the murders, and that the brains of adolescents are immature. Adolescents tend to make decisions that are inferior to adult decisions and their emotions are stronger and harder to manage.

¶ 10    With respect to the second *Miller* factor, Dr. Garbarino testified that defendant's social history and reports indicated that he grew up in a very difficult situation "without effective parenting, with a lot of disruption of parental or parental surrogate relationships, witnessing domestic violence, experiencing psychological maltreatment and neglect and a lot of chaos in the day-to-day caregiving." Defendant experienced multiple forms of trauma, including witnessing

domestic violence, "which is understood to be a primary traumatic experience; witnessing fighting, witnessing assaults, being the victim of assaults, [and] living in a dangerous fear-laden environment." Dr. Garbarino stated that defendant's father was completely absent and his mother was "psychologically unavailable because of her struggles with mental health issues and her own trauma history." Dr. Garbarino stated that defendant's mother had three children that died in a fire before defendant was born, and that she self-medicated through drugs that impaired her capacity to be an effective mother to defendant.

¶ 11    Dr. Garbarino stated that defendant's main childhood house was his maternal grandmother's house in Englewood. There was "widespread drug use in that house, widespread substance abuse amongst [defendant's] extended family." He stated that "perhaps 20" people lived in that house.

¶ 12    Dr. Garbarino further testified that defendant left school completely by tenth grade and he was in a gang by the time he was 12 years old. His neighborhood was primarily Gangster Disciples territory, but he was a Vice Lord, which "put him at odds with others in the neighborhood even for things like going to school." Defendant had been shot at, had witnessed shootings, and had friends that had been shot and killed. Dr. Garbarino described defendant's neighborhood as a "war zone," which meant that he was highly sensitive to threats and developed a "war zone mentality."

¶ 13    Dr. Garbarino explained that one of the *Miller* factors was the role of peer pressure and in the environment that defendant grew up in, "there's a lot of peer modeling of aggressive behavior, there's often a lot of peer pressure to engage in criminal and aggressive behavior." Dr. Garbarino stated that "simply the presence of peers tends to degrade the behavior of teenagers,"

which was a factor in defendant's crimes. Dr. Garbarino testified that codefendant Spaulding was a "high prestige individual" in defendant's eyes and that defendant felt a responsibility to him.

¶ 14     Dr. Garbarino stated that defendant had a newfound maturity since being in prison. He was "able to engage in reflection and study and reading," and took advantage of programs available to him. He got a job and began pursuing a GED. The GED instructor spoke positively about defendant's enthusiasm and competence. Dr. Garbarino opined that defendant would be a good candidate for parole with transitional support. Defendant has been institutionalized for a long time, and there are basic skills that individuals need, but Dr. Garbarino believed he would be a safe citizen.

¶ 15     When asked if defendant was "irretrievably depraved," Dr. Garbarino responded, "Absolutely not."

¶ 16     On cross-examination, Dr. Garbarino testified that defendant did not specifically say he was afraid of codefendant Spaulding. He also testified that defendant had siblings who were presumably exposed to the same risk factors as defendant growing up, but did not kill anyone at the age of 16.

¶ 17     The trial court then noted that it had some additional questions for Dr. Garbarino. It asked Dr. Garbarino about an error that had been in a previous draft of his report where Dr. Garbarino stated that defendant told him one of the victims had a gun. Dr. Garbarino explained, "That was an error on my part. That's why we submitted a corrected report. When I went back to the notes, I realized I had mistakenly drawn that conclusion because [defendant] had talked about being so afraid. So I accept responsibility for that error." The trial court then went into detail about the nature of the crime, asking Dr. Garbarino if he had read the trial testimony. Dr. Garbarino opined that he did not believe the crime was a planned assassination, but that it was spontaneous. The

trial court asked if defendant was failing to accept responsibility by stating he shot the victims in self-defense. Dr. Garbarino responded that defendant had not said that and it was an error on his part. When Dr. Garbarino again explained that he had drawn that conclusion from defendant stating that he was afraid, the trial court asked what defendant was afraid of and then stated, "He had the gun. Spaulding had the gun. The people in the car are half naked. What was he afraid of, according to him?"

¶ 18    Richard Bard, a former supervisor at IDOC, testified that he reviewed defendant's records, and that from 1997 to 1998, defendant received eight tickets within IDOC. During one incident in 1998, defendant attacked an officer, hit him from behind, and kicked another officer when he was on the floor. Between 2004 and 2015, defendant received five tickets, one of which was expunged. Bard testified that defendant had a "good" disciplinary record after 2001 and he had been approved to work in the inmate commissary and the officer's commissary.

¶ 19    Bard further testified that before the *Miller* decision, there were not many opportunities for someone facing life in prison without parole. The resources were primarily directed at inmates who would be transitioning back into society.

¶ 20    On June 9, 2017, the trial court pronounced its resentencing of defendant and codefendant. Initially, the trial court noted that it had read the sentencing memorandum filed on defendant's behalf and a presentence investigation on defendant. The trial court stated that it presided over defendant's jury trial and had read defendant's court files and postconviction files.

¶ 21    The State submitted victim impact statements from Gavin's and Bowen's families that had been submitted at defendant's original sentencing hearing. The State read those letters into the record. Gavin's mother stated in her letter that Gavin was her only child and had graduated from nursing school. She thinks of her only child every single day and loses sleep every night.

She has relived the night of the murder over and over, thinking of the fear her daughter must have felt in the last few moments of her life. Gavin's mother stated that she always looked forward to becoming a grandmother and a major part of her is gone forever. No mother expects to bury a child. She stated that defendant's and codefendant's mothers can still visit them in prison and give them a kiss. Instead, she has to visit her daughter at a graveyard.

¶ 22 The second letter that was read was authored by Bowen's parents. They stated that Bowen was the father of a four-year-old at the time of his murder. He loved his daughter very much. Bowen and Gavin were two people who cared about everybody and everything. Bowen's parents will never forget the day they got the news of their deaths. The pain was so great and it took them weeks to come to terms with the fact that they were gone forever. They asked that defendant and codefendant be imprisoned for life.

¶ 23 The State then asserted, "The position of the State's Attorney's Office as to these particular defendants based on the mitigation we've received would be a term of imprisonment that would not amount to a *de facto* life sentence." The trial court stated, "I'll certainly consider it."

¶ 24 Defendant then spoke on his own behalf. He stated he was so sorry for the pain and heartache he caused the victims' families. He should have refused to participate in the robbery and there was no excuse for what he did.

¶ 25 The State then argued that the two victims were innocent people, and defendant and codefendant shot into their car multiple times. The victims never had a chance and never saw it coming. There was no reason to shoot into the car. The State claimed this was not a sentence the court was giving, but rather a sentence that the defendant and codefendant had given themselves.

They were responsible when they were sentenced in 1997 and they were responsible 20 years later as they sat in court to answer for their crimes.

¶ 26    Defendant's attorney then reviewed the factors in mitigation, the *Miller* factors, and asked the court to sentence defendant "in the mid range between 20 to 60" years for the murders of Bowen and Gavin.

¶ 27    Before sentencing defendant, the trial court stated that defendant had not shown, based on his conduct while in custody that he was "irretrievably depraved," and therefore he would not be sentenced to life in prison. The trial court then went into detail about the actual crime. It described the defenselessness of the victims and the brutality of the shooting. The trial court then stated that "sorry just doesn't cut it" and noted that the victims did not get a chance to live, while defendant and codefendant still did. The trial court then stated:

> "These two gentlemen are coldhearted murderers, as simple as that. They have changed in the last give or take 20 years while they've been in custody and changed much for the better. Had they been 18 instead of 16 back at the time of these murders, we'd be talking about something besides life in prison most likely. As I said before, however, the Court cannot find that they're both irretrievable, as the *Miller* case says.
>
>        \*\*\*
>
> I am certainly going to consider that both men have done excellently well while they've been in custody. Maybe being locked up for a long time has benefited them.
>
>        \*\*\*

We're hearing all this evidence about [defendant] and [codefendant]. And it's sort of like on August 29, 1994, they were one person. They've metamorphosed into two different people now in 2017. And, oh, by the way, there's a little footnote to history, they savagely murdered Ray Bowen and Malinda Gavin. Like they're a little footnote to history. It's all about [codefendant] and [defendant]. I've considered all of it in that respect. They're not the only people in this case I've got to consider. I've got to consider Malinda Gavin and Ray Bowen. They're the ones who were murdered by these two men in a cold, calculated manner. And to hear them described as 'young boys' is a little hard to accept. They were young, but this was a crime that warrants something other than, 'go home today guys, just don't do it again.'

\*\*\*

This is a crime that shocks the conscience of a civilized society. Two young guys who are now mature men go out and kill two people for nothing, absolutely nothing at all."

¶ 28    The trial court sentenced defendant and codefendant to 60 years in prison for each murder, to run concurrently. The court stated, "a sentence [for] a crime that took place back in '94 before truth in sentencing, it's day-for-day credit. So on a sentence of 60 years they'd do 30 calendars, approximately, maybe a little less." The court noted, "[t]hey get credit for the 20 or 21 years they've been in custody so far," and stated they would be out in 8 or 9 years. The trial court added that it considered defendant and codefendant's age and "everything the lawyers on both sides argued." Defendant moved to reconsider his sentence and the trial court denied the motion. Defendant now appeals.

¶ 29                                        II. ANALYSIS

¶ 30    Defendant originally contended on appeal that the trial court abused its discretion in

sentencing him to 60 years in prison, where it failed to adequately consider the *Miller* factors. In

*Miller*, the United States Supreme Court held that "mandatory life without parole for those under

the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel

and unusual punishments.'" *Miller*, 567 U.S. at 465. The Supreme Court held that minors are

constitutionally different from adults for sentencing purposes, being less mature and responsible,

more impulsive, and more vulnerable to negative influences and peer pressure than adults, and

not having the fully formed character of adults so that their actions do not necessarily indicate

irreversible depravity. *Id*. at 471-74. The Court stated, "[w]e therefore hold that the Eighth

Amendment forbids a sentencing scheme that mandates life in prison without possibility of

parole for juvenile offenders." *Id*. at 479. The Court continued that while "appropriate occasions

for sentencing juveniles to this harshest possible penalty will be uncommon, *** we do not

foreclose a sentencer's ability to make that judgment in homicide cases." *Id*. Still, a "judge or

jury must have the opportunity to consider mitigating circumstances before imposing the

harshest possible penalty for juveniles." *Id*.

¶ 31    Our supreme court in *People v. Holman*, 2017 IL 120655, ¶ 46, considered "what it

means to apply *Miller*" and stated:

        "[A] juvenile defendant may be sentenced to life imprisonment without parole,

        but only if the trial court determines that the defendant's conduct showed

        irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond

        the possibility of rehabilitation. The court may make that decision only after

        considering the defendant's youth and its attendant circumstances. Those

characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." See also 730 ILCS 5/5-4.5-105(a) (West 2016) (codifying these factors).

¶ 32    The Supreme Court held in *Montgomery v. Louisiana*, 136 S. Ct. 718, 735 (2016) (quoting *Miller*, 567 U.S. at 465), that "[a] hearing where 'youth and attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." The Court stated:

"The [*Miller*] Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of children's diminished capacity for change, *Miller* made clear that appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (Internal quotation marks omitted.) *Id*. at 733-34.

¶ 33    Our supreme court subsequently determined that *Miller*'s holding and rationale applied not only to juvenile defendants who received mandatory life sentences without the possibility of parole but also to juvenile defendants sentenced "to a mandatory term of years that is the

functional equivalent of life without the possibility of parole," *i.e.* a *de facto* mandatory life sentence (*People v. Reyes*, 2016 IL 119271, ¶ 9), and "to discretionary sentences of life without parole" (*Holman*, 2017 IL 120655, ¶ 40). More recently, our supreme court has defined a *de facto* life sentence for a juvenile offender as one that is greater than 40 years. *People v. Buffer*, 2019 IL 12237, ¶¶ 41-42 (stating that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment" and because the "defendant's sentence was greater than 40 years," he received a *de facto* life sentence).

¶ 34    In his supplemental brief, defendant argued that his sentence was in fact a *de facto* life sentence because it was greater than 40 years. See *Buffer*, 2019 IL 12237, ¶¶ 41-42. Defendant further argued that because a trial court may only impose a life sentence on a juvenile offender "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation," (*Id.* ¶ 46), and the court in this case specifically stated, "the Court cannot find that defendant is irretrievable," it therefore could not sentence defendant to another sentence of life in prison.

¶ 35    The State responded that defendant's 60-year sentence was not a *de facto* life sentence because he was sentenced before "truth-in-sentencing," which requires those convicted of first degree murder after June 1998 to serve 100% of their imposed sentences. See 730 ILCS 5/3-6-3(a)(2)(i) (West 2008). Because defendant was sentenced before June 1998, defendant is entitled to day-for-day good-time credit. See 730 ILCS 5/3-6-3(a)(2) (West 1996) (the prisoner "shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court.") As a result, defendant, who has been

incarcerated since 1996, could be eligible for release from prison in September 2025. The State contends that because he is eligible for day-for-day credit, and therefore only likely to serve 30 years of his 60-year sentence, he did not receive a *de facto* life sentence.

¶ 36    Our supreme court has recently addressed this exact issue. In *Dorsey*, the court noted that the statutory scheme applicable to defendant "requires that a person receive 'one day of good conduct credit for each day of service in prison,' where each day of credit must 'reduce by one day the inmate's period of incarceration set by the court.' " 2021 IL 123010, ¶ 51. The court continued:

> "This day-for-day credit scheme is designed to encourage rehabilitation and enable an offender to be released after he serves half of the determinate sentence. It allows a predictable, fairly accurate assessment at the time of sentencing of the ultimate length of imprisonment. Prisoners know that they are directly accountable for their successes or failures of self-control and have a direct stake in maintaining good order and discipline while incarcerated. The statutory credit scheme provides prisoners with incentives to conform their behavior to what society will accept. Thus, an offender sentenced under the statutory scheme providing for day-for-day credit – who conforms his conduct to the prison rules – can demonstrate growth and rehabilitation, thereby procuring his own release after serving half of the judicially imposed prison term." (Internal quotations omitted.) *Id*. ¶ 52.

¶ 37    The court concluded, "[w]e find, then, that the statutory good-conduct scheme in play here provides defendant 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' before he spends more than 40 years in prison, which this court in

*Buffer* determined as the line for a *de facto* life sentence based on an extrapolation from the legislative determination." *Id*. ¶ 65. We therefore are likewise compelled to conclude that defendant's sentence, which offers an opportunity for release after serving 30 years in prison, is not a *de facto* life sentence in violation of the eighth amendment.

¶ 38    Having found that defendant's sentence is not a *de facto* life sentence, we now address defendant's argument that the trial court failed to adequately consider the *Miller* factors during the resentencing hearing. Specifically, defendant contends that while "the defense presented evidence of [defendant's] tragic social history and the impact of his youth on his conduct, the sentencing court's comments at the sentencing hearing reveal that it gave little consideration to these mitigating factors and, instead, focused primarily on the need for retribution and the nature of the crimes."

¶ 39    A reviewing court will not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion in determining a sentence where the sentence is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense. *Id*. In the absence of evidence to the contrary, we presume that the sentencing court considered all mitigating evidence presented. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51.

¶ 40    Illinois has now codified the *Miller* factors. Section 5-4.5-105(a) of the Unified Code of Corrections (Code) provides that when a person under 18 years of age commits an offense, the trial court at sentencing shall consider the following factors in mitigation: (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (2) whether the person was subjected to outside pressure, including peer pressure,

familial pressure, or negative influences; (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (4) the person's potential for rehabilitation or evidence of rehabilitation, or both; (5) the circumstances of the offense; (6) the person's degree of participation and specific role in the offense, including the level of planning by the person before the offense; (7) whether the person was able to meaningfully participate in his or her defense; (8) the person's prior juvenile or criminal history; and (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate, although, if a defendant chooses not to make a statement on advice of counsel, a lack of an expression of remorse shall not be considered as an aggravating factor. 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 41    Here, the resentencing hearing was conducted specifically for the purpose of considering the *Miller* factors. Dr. Garbarino testified that he used the factors from the *Miller* decision as the organizing framework for generating his report on defendant and presented evidence on each of the factors.

¶ 42    Evidence was presented showing that defendant was 16 years old at the time of the murders and that the brains of adolescents are immature. Defendant's social history and reports indicated that he grew up in a very difficult situation without effective parenting, with a lot of disrupting of parental or parental surrogate relationships, witnessing domestic violence, experiencing psychological maltreatment and neglect and a lot of chaos in the day-to-day caregiving. Defendant's main childhood house was his maternal grandmother's house where there was widespread drug use. Defendant left school by tenth grade and was in a gang by the time he was 12 years old. His neighborhood was described as a "war zone." Where defendant grew up there was often peer pressure to engage in criminal and aggressive behavior.

¶ 43    Evidence was presented that defendant had developed a newfound maturity since being in prison and took advantage of programs available to him. He received his GED and his instructor spoke highly of him. Dr. Garbarino testified that defendant would be a safe citizen.

¶ 44    The trial court described the nature of the crime, stating that the victims of the shooting were defenseless. It noted that while defendant and codefendant had changed for the better over the last 20 years while they were in custody, the victims were murdered in a "cold, calculated manner," and the crime "shocks the conscience of civilized society." The trial court added that it considered defendant and codefendant's age and "everything the lawyers on both sides argued."

¶ 45    Looking at the entirety of the resentencing hearing, we find that the trial court properly considered the evidence presented on each of the *Miller* factors. Although the trial court did not specifically identify which factors it considered in determining defendant's sentence, it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential. *People v. Brazziel*, 406 Ill. App. 3d 495, 499 (1993). A trial court is not required to specify on the record the reasons for the sentence imposed, nor is it required to recite and assign value to each factor presented at the sentencing hearing. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 22; *People v. Baker*, 241 Ill. App. 3d 495, 499 (1993).

¶ 46    To the extent that defendant argues that the trial court gave more weight to the severity of the crime than the mitigating factors, we note that "because the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense." *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. Accordingly, we find no abuse of discretion.

¶ 47    We granted defendant's motion to cite additional authority, but find that his reliance on *People v. Zumot*, 2021 IL App (1st) 191743, is without merit. In *Zumot*, the defendant was found

guilty of first degree murder and sentenced to 45 years in prison. *Id.* ¶ 1. His conviction was affirmed on appeal. *People v. Zumot*, No. 1-05-1068 (2009). The defendant filed a pro se postconviction petition, arguing that the trial court failed to properly consider his youth and attendant circumstances, which was summarily dismissed. *Id.* ¶ 2. On appeal from the dismissal of his postconviction petition, this court rejected the argument by the State that the trial court did in fact consider the *Miller* factors when it sentenced the defendant in 2004 – years before *Miller* was decided – simply because "information touching on those factors was included in the PSI report submitted at sentencing." *Id.* ¶ 40. We stated that "being aware of evidence relevant to the *Miller* factors is wholly distinct from considering those factors as mitigating, or carefully considering the prospect of a defendant's rehabilitative potential." *Id.*

¶ 48    In the case at bar, the resentencing hearing was for the sole purpose of presenting evidence on the *Miller* factors. The trial court did not merely review defendant's PSI. As discussed above, the court heard extensive evidence on each of the *Miller* factors and we have no reason to believe it abused its discretion when resentencing defendant.

¶ 49                                    III. CONCLUSION

¶ 50    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51    Affirmed.

17