2022 IL App (1st) 210436-U

No. 1-21-0436

Order filed May 3, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 10066 |
| | ) | |
| RORY COOK, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's denial of defendant's *pro se* motion for leave to file his sixth successive postconviction petition is affirmed where defendant failed to establish cause for not raising his claim in his prior filings.

¶ 2    Defendant Rory Cook appeals from an order of the circuit court of Cook County denying his *pro se* motion for leave to file his sixth successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). The circuit court concluded that defendant's claims were waived and that he failed to satisfy the cause and prejudice test required

for successive postconviction petitions. On appeal, defendant contends the court erred when it denied him leave to file his petition because he established cause and prejudice for raising a claim that his trial counsel rendered ineffective assistance. Defendant alleges counsel failed to investigate and present testimony from Garrett Scrutchens, who provided a written statement to police that would have corroborated defendant's claim that he shot the victim in self-defense. Defendant further contends he has cause for raising this allegation in his sixth successive petition because he learned about Scrutchens's statement years after the shooting and did not obtain a copy of that statement until March 2020. We affirm.

¶ 3     Following a 2000 jury trial, defendant was convicted of first degree murder for fatally shooting Brian Keith Bell. The facts of this case were initially presented in this court's opinion affirming defendant's conviction on direct appeal. *People v. Cook*, 352 Ill. App. 3d 108 (2004). We discuss the evidence presented as necessary for consideration of the issue in this appeal.

¶ 4     At trial, defendant's girlfriend, Dana Hunt, testified for the State that in April 1999, she and defendant lived together in a second-floor apartment in a building on the corner of 113th Street and King Drive. The building owner had disappeared and no tenants were paying rent. Four months prior to the shooting in this case, defendant allowed Bell to move into the apartment below theirs. Defendant charged Bell monthly rent, but Hunt did not know how much.

¶ 5     On April 3, 1999, the day of the shooting, Hunt returned home between 3:30 and 4 p.m. Defendant and Scrutchens were there drinking, and she joined them. About 6 p.m., defendant left to buy more alcohol. Defendant had to pass Bell's first-floor apartment to leave the building. While defendant was gone, Darryl Bunch arrived at their apartment. Defendant returned home with whiskey and beer. About 7 p.m., Bunch gave defendant $20 to buy crack cocaine from another

apartment on the first floor. Defendant left their apartment and had to walk past Bell's apartment to reach the other apartment. About 10 minutes later, Hunt heard defendant and Bell arguing in front of their building. Hunt looked out the window and observed defendant and Bell fighting across the street. Hunt went downstairs and broke up the fight. Defendant and Hunt returned to their apartment and Bell walked down the street. Defendant was bleeding from a scrape on the right side of his forehead. Defendant, Hunt, Bunch, and Scrutchens continued drinking and smoked crack. Bunch stated that defendant should have "stomped" Bell.

¶ 6      One or two hours later, defendant and Bunch left the apartment to buy more alcohol. While they were gone, Hunt went downstairs to Bell's apartment and gave Bell $10. Hunt explained that Bell had previously come upstairs to their apartment and threatened defendant because defendant owed Bell $10. When Hunt paid Bell, she asked him if the fighting could be over. Bell replied that everything was "cool." Hunt returned upstairs. Scrutchens had left the apartment but returned.

¶ 7      About 8:30 or 9 p.m., defendant and Bunch returned to the apartment and the four of them resumed drinking. Bunch told defendant that he should "pop" Bell. Bunch pulled out a gun, removed the bullets, reloaded the weapon, and set it on the table they were seated around. Defendant replied that "he would if [Bell] kept f***ing with him." Defendant also stated that if Bell started any trouble, he would put Bell "to sleep." Defendant took the gun from the table and placed it inside his back pocket. Scrutchens left the apartment.

¶ 8      Hunt testified that defendant went to lock their apartment door and she heard him and Bell arguing at the door. Hunt got between the two men and tried to separate them. The three of them "wrestled" down the stairway to the first floor. Hunt got out from between the two men and headed back upstairs. Hunt testified that she turned around and observed Bell "dragging" defendant out of

the building by his collar. Hunt looked out a square window in the door and observed that defendant had removed the gun from his pocket. Bell grabbed the gun and the two men wrestled over it. Hunt turned around and was heading upstairs when she heard gunshots. Hunt acknowledged that two days after the shooting, she gave a handwritten statement to an assistant state's attorney (ASA) in which she never stated that she observed what defendant and Bell did outside the building. Hunt further acknowledged that the day after giving her statement, she testified before the grand jury and never stated that she looked out the window and observed what happened outside. Hunt testified to the grand jury that when defendant placed the gun in his back pocket and left their apartment, she thought he was going to confront Bell.

¶ 9 On cross-examination Hunt testified that the weekend before the shooting, Bell came to their apartment several times looking for defendant, who was not home. Bell told Hunt that if defendant did not have his money, Bell "was going to kick his ass." Hunt testified that during the initial fight that occurred across the street, Bell was holding a hammer in his hand. Hunt did not know if Bell had the hammer with him during the second fight outside their apartment door.

¶ 10 On redirect examination, Hunt acknowledged that one month before trial, defendant called her and said it was important that she testify that Bell was on the second floor immediately before he was shot. Defendant did not ask her to lie. Hunt "possibly" told the ASA that Bell was standing in front of his own apartment on the first floor. Hunt also acknowledged that she told the ASA that when defendant put the gun in his pocket and headed towards their door, she knew he was going to confront Bell. As defendant went downstairs, Hunt got in front of him and tried to stop him.

¶ 11 Chicago police officers David Showers and Cordy Fouch both testified that when they arrived at the scene, Bell was lying on his back on the ground. Defendant was sitting on top of Bell

choking him. Showers pulled defendant off Bell. Bell pointed at defendant and stated several times that defendant shot him. Bell told Fouch that defendant gave the gun "to his boy who ran into the building." Fouch observed that Bell had a gunshot wound to his abdomen.

¶ 12    Chicago police detective Paul Bernatek testified that during an interrogation, defendant initially told police that Bell took the gun from him and shot himself five times. Shortly thereafter, defendant admitted that he shot Bell and that Bell did not have anything in his hands.

¶ 13    Chicago police detective Robert McVicker testified that defendant told him that he and Bunch went to Bunch's apartment together to get Bunch's gun. After they returned to defendant's apartment, Bunch loaded the weapon and handed it to defendant. Bunch told defendant to shoot Bell if they fought again. Defendant admitted that he fired the gun three times and shot Bell.

¶ 14    Chicago police detective Sylvia Van Witzenburg testified that on the evening of April 4, 1999, she and her partner, Detective Robert Arteaga, interviewed Hunt, Bunch, and Scrutchens. After speaking with Bunch, police searched defendant's apartment and recovered a firearm hidden inside a couch. Later that night, Van Witzenburg and Arteaga interviewed defendant, who told them he argued and fought with Bell the previous night. Hunt had broken up their initial fight. Defendant then returned to his apartment with Hunt where they were drinking and talking with some friends. Defendant told his friends that if Bell ever touched him again, he would have to "put him to sleep." Bunch handed defendant a loaded gun, which he put in his back pocket. Defendant heard Bell downstairs and went down to confront him. The men went outside. Defendant admitted that he knew he was going to shoot Bell if Bell touched him. The men grabbed each other and began fighting. Defendant stated that he reached into his pocket with his right hand, pulled out the gun, and shot Bell once. The men exchanged a few words, and defendant shot Bell twice more.

Bell fell to the ground and defendant got on top of him. Bunch approached the men and removed the gun from defendant's hand. Bell was still moving so defendant grabbed Bell's neck. Defendant was holding Bell down by the neck when the police arrived. Van Witzenburg specifically asked defendant if Bell ever had a gun or weapon in his hand during the fight. Defendant replied that Bell never had any type of weapon in his hand.

¶ 15    Van Witzenburg testified that, following the interview with defendant, ASAs Thomas Key and Scott Anderson arrived at the police station and interviewed defendant, Bunch, Hunt, and Scrutchens.

¶ 16    ASA Key testified that he and Anderson interviewed Hunt and Scrutchens. Key then took defendant's written statement. Therein, defendant stated that during his initial fight with Bell that night, neither defendant nor Bell had a weapon. Minutes after that fight, defendant and Bunch left defendant's apartment to go to the liquor store and to get Bunch's gun. During the ride, Bunch told defendant that he should have "whooped [Bell's] ass while he had him on the ground." After Bunch retrieved his gun, he told defendant to "pop" Bell if Bell started any more trouble. When defendant and Bunch returned to defendant's apartment, defendant told everyone that Bell had better not start any trouble with him. Hunt told defendant that she gave Bell his $10. Bunch again told defendant that he should "pop his ass," meaning he should shoot Bell. Defendant told everyone that he was going to ask Bell if "this s*** was over with," and if Bell said no, defendant was going to shoot him. Defendant also stated that he was going to put Bell "to sleep" if Bell put his hands on him. Everyone heard Bell's apartment door open. Knowing Bell was home, Bunch loaded the gun and handed it to defendant. Defendant placed the gun in his back pocket and went downstairs to confront Bell. Hunt pleaded with defendant not to go, but defendant "wanted to settle this once

and for all." The rest of defendant's statement was consistent with Van Witzenburg's testimony regarding defendant's confession. Key specifically asked defendant if Bell had any sort of weapon. Defendant replied, "no." Key acknowledged he did not ask defendant if Bell had a hammer. Key stated, "[n]o one ever mentioned hammer, he didn't mention it and I didn't mention it."

¶ 17    Defendant testified that about 3:30 or 4 p.m. on April 3, he and Scrutchens began drinking and smoking crack cocaine. Scrutchens told defendant that Bell had come to the apartment earlier looking for him. About 5 p.m., defendant left to buy liquor with $3 Scrutchens had given him. As defendant left the building, Bell asked him for $10. Defendant said he did not have the money. Bell said "okay," and entered his apartment. When defendant returned, Bell stopped him in the hallway, pointed out that he had bought liquor, and again asked him for the money. Defendant told Bell he bought the liquor with money from Scrutchens. Defendant then returned to his apartment.

¶ 18    Shortly thereafter, Hunt arrived at the apartment. About 6 p.m., Bunch arrived. Bunch gave defendant $20 to buy more cocaine. Defendant left the apartment to do so and saw Bell in the hallway. Bell tried to take the money from defendant. Defendant went out the front door and Bell chased him across the street. Bell struck defendant in the back with his ring of keys. The men began wrestling. Bell pushed defendant's head down on the concrete, scraping defendant's face. Hunt broke up the fight, and she and defendant returned upstairs to their apartment.

¶ 19    About 10 p.m., defendant and Bunch left the apartment to buy more alcohol. They stopped at Bunch's house so Bunch could call his girlfriend. During the ride, Bunch told defendant he "should have whooped [Bell's] ass." They returned to defendant's apartment and continued drinking. Defendant left the room at one point, and when he returned, there was a gun on the table.

¶ 20 Defendant heard a "big boom" noise that sounded like someone kicked in the front door of the building. Scrutchens jumped up and ran out of the apartment, leaving defendant's door open. Bunch handed defendant the gun, which defendant placed in his back pocket. Defendant did not know if the gun was loaded and was "scared of guns." Defendant went to close his apartment door and observed Bell coming up the stairs. Defendant and Bell began arguing. Hunt stood between them but then moved out of the way. Bell swung a hammer at defendant, striking him in the head above his left eyebrow. Defendant ran downstairs to get away from Bell.

¶ 21 As defendant tried to open the front door of the building, Bell grabbed the hood of defendant's sweatshirt and threw him against the door. Defendant pulled the gun out of his pocket and held it up to scare Bell. Bell grabbed the gun with both hands. The men fell to the ground and were struggling over the gun when the gun fired. Defendant did not know if Bell had been shot. Bunch approached them and removed the gun from defendant's hand. Defendant also testified that he continued to hold Bell down because he did not know who had the gun.

¶ 22 At the police station, Key told defendant that he was going to make a report of defendant's statement. Defendant asked Key for a lawyer, and Key replied that none were there. Key brought two detectives into the room and told defendant to begin his statement. Defendant admitted that he signed the inculpatory statement after Key read it to him but claimed Key and the police concocted it. Defendant did not protest at the time because he was exhausted.

¶ 23 On cross-examination, defendant testified that he did not know Bunch retrieved a gun when they went to Bunch's apartment. Defendant claimed that when he and Bell wrestled the first time and Bell struck him with the keys, he felt he was in a life-threatening situation. However, moments later defendant testified that he did not call the police about the altercation because "[i]t was no

big deal." Defendant put the gun in his pocket so neither he nor anyone else would get hurt. Defendant claimed he told Van Witzenburg and Key that Bell struck him with a hammer, but that fact was left out of his statement because Van Witzenburg said he was "making up a story."

¶ 24 On redirect examination, defendant testified that Bell did not hit him with the hammer during their initial fight. Bell struck him with the hammer when Bell came upstairs during the second fight.

¶ 25 The jury was instructed on the offenses of first degree murder, second degree murder, and involuntary manslaughter. The second degree murder instruction was based on defendant having an unreasonable belief that he was justified in using deadly force against Bell. The jury rejected defendant's claim of self-defense and found him guilty of first degree murder. The trial court sentenced defendant to 30 years' imprisonment.

¶ 26 On direct appeal, defendant argued that: (1) the police obtained his inculpatory statements in violation of his *Miranda* rights; (2) the trial court erred when it allowed three witnesses to testify about statements Bunch made encouraging defendant to shoot Bell; (3) the trial court erred when it suppressed evidence of Bell's prior violent behavior where the jury was instructed on self-defense; (4) the trial court erred when it failed to instruct the jury on the "serious provocation" theory of second degree murder; and (5) the evidence supported a conviction for involuntary manslaughter rather than first degree murder. This court rejected those arguments and affirmed defendant's conviction. *People v. Cook*, 352 Ill. App. 3d 108 (2004).

¶ 27 Since 2005, defendant has filed numerous unsuccessful *pro se* collateral pleadings challenging his conviction. This court has affirmed the dismissal of defendant's 2005 initial postconviction petition filed under the Act (*People v. Cook*, 2013 IL App (1st) 111551-U), the

dismissal of his 2011 petition for relief from judgment filed under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)) (*People v. Cook*, No. 1-11-3196 (2013) (unpublished summary order under Supreme Court Rule 23(c))), the denial of his 2012 motion for leave to file a successive postconviction petition under the Act (*People v. Cook*, 2015 IL App (1st) 123236-U), the denial of his 2013 "Motion for Prosecutorial Misconduct" (*People v. Cook*, No. 1-14-0015 (2014) (unpublished summary order under Rule 23(c))), the denial of his 2014 petition for a writ of *mandamus* (*People v. Cook*, No. 1-14-3531 (2016) (unpublished summary order under Rule 23(c))), the denial of his 2015 petition for forensic testing (*People v. Cook*, No. 1-15-2870 (2017) (unpublished summary order under Rule 23(c))), the dismissal of his 2015 petition for relief from judgment filed under section 2-1401 of the Code (*People v. Cook*, No. 1-15-3579 (2017) (unpublished summary order under Rule 23(c))), the denial of his June 2015 motion for leave to file a second successive postconviction petition under the Act (*People v. Cook*, No. 1-18-1105 (2020) (unpublished summary order under Rule 23(c))), the denial of his 2017 motion for leave to file a third successive postconviction petition under the Act (*People v. Cook*, No. 1-17-3032 (2019) (unpublished summary order under Rule 23(c))), and the denials of his August 2019 motion for leave to file a fourth successive postconviction petition under the Act and his December 2015 "Motion for New Trial for Newly Discovered Evidence" which was recharacterized in December 2019 as his fifth successive postconviction petition (*People v. Cook*, No. 1-20-0661 (2021) (unpublished summary order under Rule 23(c))).

¶ 28    On July 9, 2020, defendant filed the instant *pro se* motion for leave to file his sixth successive postconviction petition, which is his seventh petition filed under the Act. In his motion, defendant alleged his trial counsel rendered ineffective assistance because counsel failed to call

Scrutchens as a witness. Defendant stated that Scrutchens gave a signed written statement to ASA Anderson and Detective Arteaga on April 5, 1999, stating that Bell made threats against defendant to Scrutchens prior to "the confrontation." Defendant asserted that Scrutchens saw the hammer Bell "was swinging" which he used to hit defendant in the head. Scrutchens also saw Bunch remove a gun at defendant's table and described the gun. Defendant stated that Scrutchens was listed as a witness for the State and subpoenaed but failed to appear at trial. Defendant claimed that, because Scrutchens was not called as a defense witness, his statement was not presented to the jury and defendant was denied a mitigating factor at sentencing.

¶ 29    Defendant asserted he had cause for failing to raise the claim in a prior pleading because he received Scrutchens's written statement on March 20, 2020, when he received his discovery from the State which he had been waiting to receive for 21 years. He also claimed he suffered prejudice because if the jury would have heard the evidence in Scrutchens's statement, the outcome of the trial would have been different. Defendant asked the court to relax the doctrines of waiver and *res judicata* because his trial and appellate counsel were ineffective for not raising the claim earlier. Defendant requested that his conviction be vacated and he be given a new trial, or alternatively, that his conviction be reduced to second degree murder.

¶ 30    Defendant attached an accompanying successive postconviction petition to his motion. Therein, defendant restated the allegations in his motion. He further claimed trial counsel was ineffective for failing to cross-examine Arteaga and Anderson about Scrutchens's statement.

¶ 31    Defendant also attached several documents to his motion. The first document is Scrutchens's written statement given to Anderson and Arteaga. Scrutchens stated that when he and defendant were drinking alone in defendant's apartment on the day of the shooting, Scrutchens

told defendant that he spoke with Bell the previous day. Bell had told Scrutchens that defendant owed him $10 and that defendant had better pay him or Bell would "kick his ass." Scrutchens's stated that when he told defendant about this conversation with Bell, defendant did not seem too concerned about it. Scrutchens discussed hearing the initial fight outside between defendant and Bell. Hunt and Bunch went outside. Scrutchens remained inside the apartment and did not go outside because he did not want to get involved in defendant and Bell's argument.

¶ 32 Scrutchens decided to leave. As he walked downstairs, defendant, Hunt, and Bunch were returning upstairs. Defendant went inside his apartment. Bell exited his first-floor apartment with a hammer in his hand. Bunch and Hunt were still on the stairs. Bunch and Bell began yelling at each other. Bell then left the building and walked down the street. Hunt and Bunch returned to the apartment upstairs. Scrutchens left the building and drove away in his vehicle.

¶ 33 Scrutchens returned to the apartment to check on Hunt because she had been drinking. He parked in front of the building. Scrutchens observed Bell walk down the street and return to his apartment. At that moment, Bunch, who had been sitting in his vehicle, pulled away but then returned. Defendant and Hunt came downstairs. Defendant left with Bunch to go to the liquor store. Scrutchens and Hunt went upstairs to the apartment. Defendant and Bunch returned a half-hour later and they all continued drinking. Bunch told defendant, "[y]ou should have stomped [Bell] when you had him on the ground." Scrutchens told Bunch not to encourage defendant to "mix it up" with Bell. Hunt told defendant and Bunch to "let it go" because she had already paid Bell the $10 defendant owed him.

¶ 34    Bunch pulled out a metallic snub-nose .38-caliber revolver. Scrutchens did not want to be involved in what was happening. He left the apartment without saying anything to anyone. He got into his vehicle and drove home. The next afternoon he learned Bell had been killed.

¶ 35    The second document defendant attached to his motion was the transcript of Scrutchens's grand jury testimony given April 6, 1999. Scrutchens's grand jury testimony was substantially the same as his written statement. In his grand jury testimony, Scrutchens acknowledged that he gave a written statement to Anderson and Arteaga the previous day and identified that statement. He stated that the facts in his written statement were the same as those he told to the grand jury.

¶ 36    Third, defendant attached portions of a police supplementary report from the investigation of the shooting. The report includes details about the detectives' interviews with defendant, Bunch, Hunt and Scrutchens. The details of Scrutchens's interview are substantially the same as the facts in his written statement. The report further indicated, "Garrett stated he had not been present during the shooting and could not add any further information at this time."

¶ 37    Fourth, defendant attached his own affidavit notarized on July 26, 2019. Defendant averred, "Garrett Scruthens talk with Thomas Key ASA. Also gave a statement that he witness Keith Bell with a hammer in his hand. Garrett Scruthens statement was never heard in front of my jury. See (G-85) on record Thomas Key testimony that is attached. Also see (G-109) Line 9 and 10." Defendant attached those pages of Key's trial testimony wherein Key acknowledged he interviewed Scrutchens and Hunt. Key stated he did not take any notes during those interviews.

¶ 38    Fifth, defendant attached two pages from defense counsel's opening statement at trial. Therein, counsel stated that Bell had a hammer earlier in the day that was observed by Hunt, Scrutchens, and Bunch. Counsel stated, "[t]hat's the hammer that he used to hit Rory Cook when

this fight took place." Counsel stated that Bell had threatened to "whip [defendant's] ass" the night before he was killed. Counsel stated that on the day Bell was killed, Bell had threatened Bunch with the hammer, and during the second fight, Bell hit defendant in the head with the hammer.

¶ 39 Finally, defendant attached the State's Attorney's Investigator Request Form indicating Scrutchens was personally served with a subpoena to appear as a witness at trial. The subpoena directed Scrutchens to appear in court to testify on August 21, 2000.

¶ 40 Defendant did not attach an affidavit from Scrutchens indicating that Scrutchens was willing to testify for defendant at trial.

¶ 41 On March 18, 2021, the circuit court found that defendant's allegations were waived, and alternatively, that they were without merit. The court pointed out that Scrutchens's statement did not claim defendant was innocent. The court found that, because Scrutchens was not present during the shooting, it was not unreasonable for counsel to not call him as a witness. The court further found that defendant was not prejudiced by counsel's failure to call Scrutchens because Scrutchens could not explain the events that led to the shooting or identify the shooter. In addition, the court found defendant was not prejudiced where he confessed to police and testified at trial that he shot Bell in self-defense. The circuit court concluded that defendant failed to satisfy the cause and prejudice test required for successive postconviction petitions, and thus, denied his motion for leave to file the petition.

¶ 42 On appeal, defendant contends the circuit court erred when it denied him leave to file his sixth successive postconviction petition because he established cause and prejudice for raising his claim that his trial counsel rendered ineffective assistance. Defendant alleges counsel failed to investigate and present testimony from Scrutchens, whose written statement to police would have

- 14 -

corroborated defendant's claim that he shot Bell in self-defense. Defendant claims that Scrutchens's testimony that he observed Bell carrying a hammer shortly before the shooting would have corroborated his testimony that Bell struck him in the head with a hammer, thus supporting his theory of self-defense. Defendant further contends he has cause for raising the allegation in his successive petition because he learned about Scrutchens's statement years after the shooting and did not obtain a copy of that statement until March 2020. Defendant claims he was prejudiced by the omission of Scrutchens's testimony because if the jury had heard another witness support defendant's account of what occurred, there is a good chance the verdict would have been different.

¶ 43 The State responds that the circuit court correctly determined that defendant failed to satisfy the cause and prejudice test. The State asserts that defendant has no cause for raising the issue in a successive petition because he was aware of counsel's failure to call Scrutchens as a witness prior to filing his first postconviction petition in 2005, and thus, could have raised the issue on direct appeal or in his first petition. The State points out that defendant was with Scrutchens before, during, and after the first altercation with Bell and prior to the shooting. In addition, the State notes that documents in the record from defendant's previous filings show he was aware of Scrutchens's statement as early as 2001 when he referred to it in a *pro se* motion to reduce his sentence. Defendant also previously attached the supplemental police report containing Scrutchens's interview referencing his observation of Bell with the hammer to his 2017 motion for leave to file his third successive postconviction petition. The State further argues defendant was not prejudiced because Scrutchens's proposed testimony had no reasonable probability of changing the outcome of defendant's trial where Scrutchens was not present during the shooting and the evidence against defendant was overwhelming.

¶ 44    We review the circuit court's denial of leave to file a successive postconviction petition *de novo*. *People v. Dorsey*, 2021 IL 123010, ¶ 33. The Act provides a process whereby a prisoner can file a petition asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2020); *Dorsey*, 2021 IL 123010, ¶ 31. Both the legislature and our supreme court have made it clear that only one postconviction proceeding is contemplated under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 22. It is well settled that successive postconviction petitions are disfavored. *Id.* ¶ 29. "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2020).

¶ 45    Pursuant to section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2020)), defendant is prohibited from filing a successive postconviction petition without first obtaining leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27. Generally, such leave is granted only where defendant establishes cause for his failure to raise the claim in his initial postconviction proceeding, and prejudice results from that failure. 725 ILCS 5/122-1(f); *Dorsey*, 2021 IL 123010, ¶ 32. "Cause" is defined as "any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial post-conviction proceeding." *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). Prejudice occurs where the petitioner is "denied consideration of an error that so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* at 464. Defendant must satisfy both prongs of the cause and prejudice test before he will be allowed to file a successive petition. *People v. Davis*, 2014 IL 115595, ¶ 14. The court should deny leave to file a successive petition when it is clear from the petition and supporting documents that the allegations raised fail as a matter of law or are insufficient to justify further proceedings. *Dorsey*, 2021 IL 123010, ¶ 33.

¶ 46    Here, we find defendant failed to satisfy the cause and prejudice test to be granted leave to file his sixth successive postconviction petition. Defendant alleges his trial counsel rendered ineffective assistance because counsel failed to call Scrutchens as a witness at his trial over 20 years ago. Defendant asserts he has cause for raising the allegation now and that he could not have raised it in any of his prior pleadings because he received Scrutchens's written statement on March 20, 2020. However, defendant's claim that he was unaware that Scrutchens was a potential defense witness and unaware of the contents of Scrutchens's statement is belied by the record.

¶ 47    The record reveals that, on the day of the shooting, defendant and Scrutchens were together drinking and using drugs in defendant's apartment, from about 3:30 p.m. until shortly before the shooting, which occurred about 10:30 p.m. Defendant therefore knew Scrutchens was present at the scene before, during, and after the initial fight between defendant and Bell, and immediately prior to the shooting. Defendant even testified at trial that while he and Scrutchens were drinking that afternoon, Scrutchens told him that Bell had come to defendant's apartment looking for him. The record thus shows that, from the date of the shooting, defendant was clearly aware that Scrutchens was a potential witness for him. Accordingly, defendant could have raised his claim that counsel was ineffective for failing to call Scrutchens as a witness in his initial postconviction petition in 2005.

¶ 48    Furthermore, defendant's motion to file his successive petition and the record indicate that defendant and trial counsel expected Scrutchens to testify as a witness for the State and expected him to testify that he saw Bell with a hammer. Defendant expressly stated in his motion that Scrutchens was listed as a witness for the State and subpoenaed but failed to appear at trial. The record indicates Scrutchens was listed as a potential witness in the State's answer to discovery.

Scrutchens's name was included in the list of possible witnesses read to the jury venire during *voir dire*. Significantly, during her opening statement at trial, defense counsel stated that Scrutchens saw Bell with a hammer. Counsel stated to the jury:

> "Brian Keith [Bell] had a hammer on him. He had a hammer earlier in the day, that hammer was seen by both Dana, the defendant's girlfriend, by Gary Scruthens, the defendant's friend, and by Darryl Bunch. That's the hammer that he used to hit Rory Cook when this fight took place."

The record also shows that during cross-examination, trial counsel elicited testimony from Hunt that Bell was holding a hammer in his hand during the initial fight, and that Bell told Hunt if defendant did not have his money, Bell "was going to kick his ass." Based on her opening statement, it appears counsel was prepared to elicit similar testimony from Scrutchens if he had been called as a witness by the State. Hence, defendant could have challenged counsel's failure to call Scrutchens as a witness during his direct appeal or his initial postconviction petition.

¶ 49    In addition, the record shows that in his *pro se* petition for *mandamus* filed in July 2014, defendant claimed he filed a *pro se* motion to reduce his sentence on April 30, 2001, that the clerk of the circuit court failed to forward to the court. Defendant attached a copy of his "Motion to Reduce Sentence" to his *mandamus* petition. The motion is dated April 25, 2001, which is 13 days after he was sentenced. In his motion, defendant stated:

> "My jury never heard Gary Struchens statement. He made a sworn statement in front of the grand jury plus he was subpoena to court and never show up. If the jury would have heard his statement that tell how the victim was attacking Dana, Darrell Bunch, and also Gary with this hammer they would have found another verdict."

¶ 50 Thus, within two weeks of his trial, defendant alleged he was prejudiced by the omission of Scrutchens's statement that Bell had attacked Scrutchens, Hunt, and Bunch with a hammer, and that Scrutchens's statement would have changed the outcome of his trial. This is substantially the same claim defendant raised in his instant motion to file a successive postconviction petition. In Scrutchens's grand jury testimony, which defendant attached to his instant motion, Scrutchens acknowledged that he gave a written statement the previous day and that the facts in his written statement were the same as those he told to the grand jury. These documents show that defendant was aware of the information contained in Scrutchens's written statement no later than two weeks after his trial.

¶ 51 Based on this record, we find that defendant could have raised his allegation that his trial counsel was ineffective for failing to call Scrutchens as a witness in his initial postconviction petition filed in 2005. Accordingly, defendant has failed to establish cause for raising his claim in a successive postconviction petition. 725 ILCS 5/122-1(f); *Dorsey*, 2021 IL 123010, ¶ 32. Based on defendant's failure to satisfy the cause and prejudice test, the circuit court's denial of his *pro se* motion for leave to file a sixth successive postconviction petition was proper. *Davis*, 2014 IL 115595, ¶ 14.

¶ 52 For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53 Affirmed.